FILED by _TS_ D.C.
ELECTRONIC

**June 26, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

VERONICA KELLY, a citizen of Pennsylvania,
individually and on behalf of all others
similarly situated,

CASE NO:

# 08-21843-CIV-MORENO/TORRES

        Plaintiff,

**CLASS ACTION**

vs.

PALMER, REIFLER & ASSOCIATES, P.A.,
a Florida partnership

        Defendant.

_____/

## COMPLAINT

    Plaintiff Veronica Kelly, individually and on behalf of all others similarly situated, brings

this action against Palmer, Reifler & Associates, P.A. (hereinafter "the Palmer Law Firm").

## I.  BACKGROUND FACTS

    1.     This case is brought on behalf of innocent persons across the country against the

Palmer Law Firm to stop them from sending millions of deceptive, unfair and oppressive form civil

recovery demand letters and to recoup the tens of millions of dollars they have extorted for

themselves and their retail clients.

    2.     In the late 1980s, large retailers hired lobbyists to encourage state legislatures across

the country to enact what are known as "civil recovery statutes," touted as a method to recoup losses

from retail theft.  This legislation allows retailers to seek significant civil damages and penalties

from consumers that have committed retail theft.  The theory behind the legislation is that retailers

can keep prices lower and recoup some of their losses by placing the cost for retail theft on those

who have actually shoplifted.  All fifty states have since passed civil recovery statutes.

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

Dockets.Justia.com

3.     The Palmer Law Firm has abused this legislation, however, by creating a massive collection mill whereby hundreds of thousands of letters are generated each and every month and sent to consumers across the nation without any attorney review. These generic form letters are meant to harass, intimidate and coerce consumers into paying a large fine by threatening civil action (which they have no intention of filing) by a local attorney (that has no involvement in the case) and a visit from the "sheriff" (which they know won't happen).

4.     The Palmer Law Firm Enterprise and scheme (as defined below) is complicated but very efficient. The Palmer Law Firm joined forces with non-lawyers who had experience in retail loss prevention and implemented an intricate nationwide scheme utilizing sophisticated computer software. The Palmer Law Firm receives an electronic file from its retail clients each month with the names of consumers detained in the store and a minimal amount of data, including their age, the date of their detention, their address and the amount of the merchandise allegedly at issue. *See* Transcript of Partner Natt Reifler, attached hereto as Exhibit A at 107,166,167. The Palmer Law Firm uses the software to automatically generate a form demand letter based on that information that automatically calculates the demand amount and electronically affixes a local attorney's signature to the letter. *Id*. at 125, 126.

5.     Palmer's Orlando office generates and mails between 80,000 and 120,000 form demand letters *each* month and over a million letters each year. *Id*. at 61. Clearly, this type of high-speed, automated review is done without any exercise of independent professional judgment by an attorney.

6.     Every form demand letter threatens a civil action against the consumer even though the Palmer Law Firm has filed few, if any, civil actions on behalf of its retail clients. *See* form letters, attached hereto as Composite Exhibit B; *see also* Exhibit A at 35, 255. Every letter also

2

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

intimidates the consumer by using bold and underlined text that falsely implies that a local attorney has conducted a professional evaluation of the claim against them and threatens the possibility that a sheriff will personally come to their door. Exhibit B.

7.     The Palmer Law Firm has sold this scheme to most of the large retailers in this country by touting that they are "more effective" than the typical mill because of the "protections inherent in dealing with a law firm," such as the attorney-client privilege and the patina of legitimacy that a law firm lends to the collections process. *See* screen shots of Palmer website dated June 24, 2008, attached hereto as Composite Exhibit C. Also, the demand letters are sent from a local attorney with a local post office box which, according to Reifler, "tends to drive a higher level of urgency in the defendant's mind and can drive higher collection results." *Id.*

8.     The Palmer Law Firm has sold this scheme to over fifty (50) retail clients, the largest of which include major retailers Wal-Mart, JC Penney, K Mart and Walgreens. Exhibit A at 28, 37. Each of these retailers has directly profited from this illegal scheme.

9.     The Palmer Law Firm has also profited greatly as a result of this scheme. Since its inception, they have been paid millions and millions of dollars at the consumers' expense. *See* Exhibit A at 30 (annual Palmer Law Firm income "under ten million a year"). And that is only Palmer's share. The Palmer Law Firm has contracted with each of its retail clients for a percentage (ranging from 18% to 30%) of the income generated from this scheme. *Id.* at 30, 31. Like all collection mills, the Palmer Law Firm has created a website for consumers to pay these exorbitant, unsubstantiated amounts on line at "Palmer Pay.com" using credit and debit cards and banking accounts. *See* Exhibit C.

10.     The Palmer Law Firm has reaped huge profits by sending volumes of letters nationwide, including states in which they are not authorized to practice law. In order to do this, the

3

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

Palmer Law Firm came up with a plan whereby they pay local attorneys, usually sole practitioners, a few hundred dollars a month for the right to electronically stamp their signatures on the millions of letters they send. Exhibit A at 33. These attorneys do not review the letters before they are sent and have no meaningful interaction with the consumer. Instead, they simply lend their names and bar licenses in exchange for a monthly fee.

11.     The other hurdle that the Palmer Law Firm had to overcome in order to maximize profits and succeed with its scheme was the Fair Debt Collection Practices Act ("FDCPA"). In a premeditated attempt to avoid all of the rules that protect consumers, the Palmer Law Firm asked for and obtained an informal advisory letter stating that their scheme was not governed by the FDCPA since they are not technically collecting a "debt" but instead seeking settlement of a tort offense. *See* Exhibit D. In so doing, the FTC did not in any way condone the Palmer Law Firm's scheme and did not offer an opinion on whether the scheme violates other laws.

12.     In fact, according to a commissioner from the FTC, one of the most frequently reported abuses by debt collectors -- that specifically includes law firms -- is the use of deceptively worded demand letters threatening criminal and civil legal action without any intention of proceeding with such actions. *See* Exhibit E. The FTC has filed numerous enforcement actions against law firms that send these types of form demand letters without performing a professional review of each case to confirm that the claim alleged is viable.

13.     Numerous courts across the country have held that similar demand letters are "deceptive" and "misleading" and may directly violate the FDCPA. Moreover, courts may look to violations of statutes such as FDCPA when determining violations of Florida's Deceptive and Unfair Trade Practices Act. The Palmer Law Firm's scheme, described herein, clearly violates FDCPA and as such, violates FDUTPA.

4

14.     This scheme has been challenged by consumers across the country but has not been stopped, either because the wrong legal theory was used and/or the case was settled. This lawsuit seeks to stop this practice, once and for all.

## II. <u>JURISDICTION AND VENUE</u>

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, as it is an action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962.

16.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because the Plaintiff is a citizen of Pennsylvania and the Defendant is a citizen of Florida and because there are 100 or more class members and the aggregate amount in controversy exceeds $5,000,000.

17.     This Court has jurisdiction over the Palmer Law Firm because they are doing business in Florida, are licensed to practice law in Florida, and intentionally avail themselves of the Florida consumer market.

18.     The Palmer Law Firm, its attorneys and over 90 employees are all based in Florida. Exhibit A at 16. All of the form civil demand letters are generated and sent from the Orlando, Florida office. *Id*. at 54. The solo practitioners from other states are often (if not always) hired over the telephone from Florida, and merely lend their name to the form letters. *Id*. at 19, 51. However, these local attorneys have no substantive involvement in the review or processing of the form letters and have no discretion as to whom they are sent.

19.     All communications between the Palmer Law Firm, the retailers and class members are conducted from the Orlando office. *Id*. at 56, 63. All payments from class members as result of this scheme are made to and processed by the Florida office.

5

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

20.     Venue is proper in this forum because at all times relevant hereto, a substantial portion of the practices complained of herein occurred in the Southern District of Florida and/or because the Palmer Law Firm has received substantial compensation as a result of doing business in the Southern District of Florida. Moreover, the Palmer Law Firm, at all times material to the allegations contained herein, personally and/or through an agent operated, conducted, engaged in and carried on a business venture in the Southern District of Florida and/or engaged in substantial activity within this state and district.

## III. THE PARTIES

21.     Plaintiff Veronica Kelly, a Pennsylvania resident, has received numerous letters and phone calls from the Palmer Law Firm on behalf of J.C. Penny, demanding payment for an alleged theft by her daughter at a J.C. Penny. *See* Exhibit B. The Palmer Law Firm sent this letter without review by any attorney before making this demand. Ms. Kelly has informed the Palmer Law Firm that there is no basis for this claim, but they continue to send letters and call her.

22.     Defendant the Palmer Law Firm is a Florida partnership, doing business throughout this district. Plaintiff reserves the right to name additional defendants, including the individual retailers, as soon as Plaintiff has the opportunity to conduct discovery.

## IV. RICO ALLEGATIONS

**The Palmer Law Firm Enterprise**

23.     Plaintiff, the class members and Defendant are "persons" within the meaning of 18 U.S.C. §1961(3).

24.     Based upon Plaintiff's current knowledge, the following persons constitute a group of individuals associated in fact that Plaintiff refers to as the "Palmer Law Firm Enterprise" ("PLFE"): (1) the Palmer Law Firm; (2) various retailers, (3) local attorneys from around the country; and (4)

6

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

APIS Asset Protection Information System, a web based data management tool for loss prevention data produced by the design team at RuMe Interactive Corporation and Learn it Solutions ("RIC") in Farmingdale, NY.

25. The PLFE is an ongoing organization which engages in, and whose activities affect, interstate commerce.

26. While the participants are members of the PLFE, and are part of it, they also have an existence separate and distinct from the enterprise.

27. In order to successfully extort money from consumers in the manner set forth above, the Palmer Law Firm uses a system that allows it to manipulate and control civil theft collection threats to customers and conceal the true facts about that collection. The PLFE provides the Palmer Law Firm with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. The Palmer Law Firm controls and operates the PLFE as follows:

> (a) By developing themselves, and, through the PLFE, a scheme whereby the retailers provide the Palmer Law Firm with consumer information;
>
> (b) By agreeing that this consumer information would be processed using software developed by RIC and other third party entities in order to generate a form demand letter;
>
> (c) By engaging local attorneys to allow their names to be affixed on the form demand letters without attorney review;
>
> (d) By agreeing to use and using millions of these form letters to demand from consumers a computer-generated amount via the U.S. mail and other methods;
>
> (e) By engaging and paying RIC and other third party entities to develop automated systems for collecting the demanded amounts;
>
> (f) By agreeing to and using those systems to process claims and demand payments.

28. As set forth above, the PLFE has an ascertainable structure separate and apart from

7

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

the pattern of racketeering activity in which the Defendant engages.

**Predicate Acts**

29.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, the Palmer Law Firm has engaged, and continues to engage, in conduct violating each of these laws to effectuate their scheme.

**Violations of 18 US.C. §§1341 and 1343**

30.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Palmer Law Firm, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to form demand letters.

31.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Palmer Law Firm, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things which include but are not limited to form demand letters.

32.     The matter and things sent by the Palmer Law Firm via the Postal Service, commercial carrier, wire or other interstate electronic media include, *inter alia,* material containing false and fraudulent misrepresentations to consumers that purports to be a claim from a local attorney that has reviewed it, when it is not and threatens the filing of a civil lawsuit and a visit from the sheriff, with no actual intent to file such a lawsuit.

33.     Other matter and things sent through or received from the Postal Service, commercial

8

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

carrier or interstate wire transmission by the Palmer Law Firm include information or communications in furtherance of or necessary to effectuate the scheme.

34. The Palmer Law Firm's misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff and the class and obtaining their property for the Palmer Law Firm's gain.

35. The Palmer Law Firm either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiff and the class relied on the misrepresentations and omissions as set forth above.

36. As a result, the Palmer Law Firm has obtained money and property belonging to the Plaintiff and class members, and Plaintiff and the class have been injured in their business or property by Defendant's overt acts of mail and wire fraud.

**Pattern of Racketeering Activity**

37. Palmer Law Firm has engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, within the past ten years. In fact, the Palmer Law Firm has committed thousands of acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff and class members.

38. The multiple acts of racketeering activity which the Palmer Law Firm has committed and/or conspired to commit, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

9

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

# V. **CLASS ACTION ALLEGATIONS**

39.     Plaintiff brings this action against Defendant pursuant to Rule 23(a) and (b)(3) of the

Federal Rules of Civil Procedure, and Local Rule 23.1 on behalf of herself and all other persons

similarly situated.  Plaintiff seeks to represent the following classes:

### 1. Injunctive Class

(FDUPTA and RICO claims only)

All individuals in the United States, who after June 26, 2004, received a letter
from the Palmer Law Firm demanding civil damages pursuant to a state civil
recovery statute.  The class excludes all persons that were convicted of retail
theft.

### 2. Monetary Class

All individuals in the United States, who after June 26, 2004, received a letter
from the Palmer Law Firm demanding civil damages pursuant to a state civil
recovery statute and made a payment.  The class excludes all persons that were
convicted of retail theft.

## Numerosity

40.     The individual Class members are so numerous that joinder of all members is

impracticable.  The Classes, upon information and belief, each consist of hundreds of thousands of

customers, who can be identified in the business records maintained by the Defendant.  The precise

number of Class members can only be obtained through discovery but the numbers are clearly more

than can be consolidated in one complaint and impractical for each to bring suit individually.

Plaintiff does not anticipate any difficulties in the management of the action as a class action.

## Commonality

41.     This cause raises common questions of law and fact.  These common questions

predominate over any questions that go particularly to any individual member of the Class.  Among

such common questions of law and fact are the following:

10

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

a. Whether Defendant has participated in a scheme to defraud or obtain money by means of false pretenses, representations or promises, in violation of 18 U.S.C. §1341 and 18 U.S.C. §1343;

b. Whether the PLFE constitutes an "enterprise" under RICO;

c. Whether the PLFE has committed a "pattern of racketeering activity" under RICO;

d. Whether Defendant's form demand letter and practice in sending it is a deceptive, unfair and/or unconscionable scheme in violation of FDUTPA;

e. Whether due to Defendant's uniform acts, as alleged herein, Defendant was unjustly enriched or received payments and/or monies that under principles of equity they cannot retain;

f. The amount of damages the Monetary Class has sustained as a result of the Defendant's wrongful conduct, and the proper measure of such damages.

**Typicality**

42.     Plaintiff Kelly is a member of the class. She has received at least three form letters and continues to receive phone calls and letters from the Palmer Law Firm. *See* Exhibit B. Plaintiff's claims are typical of the claims of the class because of the similarity, uniformity, and common purpose of the unlawful conduct of the Defendant.

**Adequacy of Representation**

43.     Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him. There is no hostility between Plaintiff and the unnamed class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

44.     Plaintiff has chosen the law firms of Kozyak, Tropin & Throckmorton, Harke & Clasby LLP, and Spector, Roseman & Kodroff, to represent her in this matter. These firms are very experienced in class action litigation. They also have the financial and legal resources to meet the

11

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

substantial costs and legal issues associated with this type of litigation.

**Requirements of Fed. R. Civ. P. 23(b)(3)**

45.      The questions of law or fact common to the claims of Plaintiff and of each Class

member predominate over any questions of law or fact affecting only individual members of the

class.  All claims by Plaintiff and the unnamed Class members are based on the same basic scheme

same form demand letter generated by Defendant and sent to class members.

46.      Common issues predominate when, as here, liability can be determined on a class-

wide basis, even when there may be some individualized damage determinations.

47.      Where, as in this case, the liability issue is common to the class, common questions

predominate over individual questions.

**Superiority**

48.      A class action is superior to thousands of individual actions in part because of the

following non-exhaustive factors:

> a.      Joinder of all Class members would create extreme hardship and inconvenience for the affected persons as they reside all across the country.
>
> b.      Individual claims by the class members are impractical because the costs to pursue individual claims far exceed the value of what any one Class member has at stake.  As a result, individual Class members have no interest in prosecuting and controlling separate actions.
>
> c.      There are no known individual Class members who are interested in individually controlling the prosecution of separate actions.
>
> d.      The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.
>
> e.      Individual suits would not be cost effective.
>
> f.      The action is manageable as a class action.

## COUNT I

## DAMAGES FOR VIOLATION OF RICO, 18 U.S.C. § 1964(C)

12

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

49.     Plaintiff incorporates and realleges paragraphs 1-48 above as if fully set out herein.

50.     This claim for relief arises under 18 U.S.C. § 1964(c).

51.     In violation of 18 U.S.C. § 1962(c), Defendant has, as set forth above, conducted, or participated directly or indirectly in the conduct of, the affairs of the PLFE through a pattern of racketeering activity and through the use of the wire and mail.

52.     In violation of 18 U.S.C. § 1962(d), Defendant has, as set forth above, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the PLFE through a pattern of racketeering activity and through the use of the wire and mail.

53.     As a direct and proximate result, Plaintiff and class members have been injured in their business or property by both the predicate acts which make up the Defendant's patterns of racketeering activity and their investment and reinvestment of income there from to operate, expand and perpetuate the PLFE through the use of the wires and mail and specifically mail fraud.

54.     Specifically, Plaintiff and class members have been injured in their business or property by the PLFE's civil theft demands and the subsequent payment of those demands.

**WHEREFORE**, the Plaintiff and the members of the Class seek a judgment in their favor against the Palmer Law Firm for treble the amount of damages suffered by them in the form of payments made to Defendant as a result of its predicate acts and violations of Sections 1962(c) and (d) of RICO, together with treble the amount of interest due on payments delayed or withheld through the Defendant's predicate acts and RICO violations.


### COUNT II

### DECLARATORY AND INJUNCTIVE RELIEF UNDER 18 U.S.C. §1964(A)

13

Harke & Clasby LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

55.     Plaintiff incorporates and realleges paragraphs 1-48 above as if fully set out herein.

56.     This claim arises under 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962, and under 28 U.S.C. § 2201 which authorizes associated declaratory relief.

57.     As set forth in Count I above, Defendant has violated 18 U.S.C. §§ 1962(c) and (d), and will continue to do so in the future.

58.     Enjoining the Defendant from committing these RICO violations in the future and/or declaring their invalidity is appropriate as the Plaintiff and the Class have no adequate remedy at law, and will, as set forth in paragraphs 1-51 above, suffer irreparable harm in the absence of the Court's declaratory and injunctive relief.

**WHEREFORE**, Plaintiff and the members of the Class seek injunctive relief preventing the Palmer Law Firm from employing automated processing techniques that allow for improper and inadequate review prior to generating civil theft demand letters and from sending letters that contain misrepresentations and omissions. Plaintiff and the Class members further pray for an award of attorneys fees where permitted by law and such other relief as the Court deems just and proper.

<u>COUNT III</u>

<u>MONEY HAD AND RECEIVED</u>

59.     Plaintiff realleges and incorporate Paragraphs 1 through 48 of this Complaint as if fully set forth herein and further alleges as follows:

60.     The Palmer Law Firm obtained money and has attempted to collect amounts for which it ought to return to the Class. The Palmer Law Firm should also cease its attempts to collect

14

HARKE & CLASBY LLP<br>155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

such amounts.

61.     The Palmer Law Firm has obtained money from the Class members through unfair and unreasonable practices, and thus is obliged to refund the money. The Defendant has taken undue advantage of the Class members.

62.     The Palmer Law Firm has also obtained money from the Class members through unfair, unreasonable, and unconscionable practices that ultimately confer no true benefit upon Class members, and thus are obliged to refund the money. The Palmer Law Firm has taken undue advantage of the Class members in this respect as well.

63.     Thus, the Palmer Law Firm must refund such amounts that were charged and collected from the Class members. The Defendant should also be required to forever cease to attempt to collect these unreasonable amounts from the Class members.

**WHEREFORE**, Plaintiff and the Class demand judgment against the Palmer Law Firm for compensatory damages, pre and post judgment interest, attorneys' fees, declaratory and injunctive relief, costs incurred in bringing this action, and any other relief the Court deem just and proper.

## COUNT IV

## UNJUST ENRICHMENT

64.     Plaintiff realleges and incorporates Paragraphs 1 through 48 of this Complaint as if fully set forth herein and further allege as follows:

65.     The Palmer Law Firm has received, and continues to receive, a benefit at the expense of the Nationwide Monetary Class, and have knowledge thereof.

66.     The Defendant has deceptively charged, attempted to collect and collected amounts that they have unjustly retained at the expense of the members of the Monetary Class.

15

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

67.     The circumstances are such that it would be inequitable for the Palmer Law Firm to retain the benefit without paying the value thereof to the members of the Class.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated individuals, demands judgment against the Palmer Law Firm for compensatory damages, pre and post judgment interest, attorney's fees, declaratory and injunctive relief, costs incurred in bringing this action, and any other relief the Court deem just and proper.

## COUNT V

## VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

68.     Plaintiff realleges and incorporates Paragraphs 1 through 48 of this Complaint as if fully set forth herein and further alleges as follows:

69.     Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, et seq. ("FDUTPA"), prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204.

70.     The stated purpose of FDUTPA is to protect persons from "those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202.

71.     The Defendant has engaged and engages in the conduct of trade and/or commerce in the Florida and the deceptive conduct alleged herein was developed and implemented in Florida and than carried out across the country.

72.     The policies, acts and practices alleged herein were intended to result and did result in the payment of millions of dollars.  Specifically:

> a.      Defendant engaged in unfair and deceptive practices by sending out millions of form letters without any attorney review or determination that there was good cause to send them;

16

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

b.    Defendant engaged in deceptive practices by falsely representing that a civil lawsuit would be filed against the consumer without any intention of filing one;

c.    Defendant engaged in unfair and deceptive practices by intimidating consumers with a threat that the Sherriff would come to their home if they did not make a payment, with full knowledge that this was false;

d.    Defendant engaged in unfair and deceptive practices by paying out of state attorneys a nominal fee to use their computer generated signature and a local post office box, thereby making the consumer believe that a local lawyer was involved, when the local lawyer had no involvement whatsoever in the process.

73.    Defendant's scheme was conceived, devised, planned, implemented, approved, and carried out in the State of Florida, which has an interest in prohibiting violations of FDUTPA within the state and/or carried out across the country.

74.    Plaintiff and the Class members are persons that have sustained damages as a direct and proximate result of Defendant's unfair and unconscionable practices. Fla. Stat. §501.211(2) provides Plaintiff and the Class members a private right of action against the Defendant, and entitles the Monetary Class to recover their actual damages and the Injunctive class to injunctive relief, including an order that Defendant immediately cease and desist this unconscionable practice.

75.    Plaintiff and the Class members have suffered and will continue to suffer irreparable harm if the Defendant continues to engage in such deceptive and unfair practices.

**WHEREFORE,** Plaintiff, on behalf of herself and all similarly situated individuals, demands judgment against the Palmer Law Firm for compensatory damages, pre and post judgment interest, attorney's fees, injunctive relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on any and all counts for which trial by jury is permitted by law.

17

HARKE & CLASBY LLP
155 South Miami Avenue • Suite 600 • Miami, FL 33130 • Tel. 305-536-8220 • Fax 305-536-8229

Respectfully submitted this 26th day of June, 2008.

Lance A. Harke, P.A.
Florida Bar No.: 863599
lharke@harkeclasby.com
Alison C. Harke, Esq.
Florida Bar No.: 871291
aharke@harkeclasby.com
HARKE & CLASBY LLP
155 S. Miami Ave., Suite 600
Miami, Florida 33130
T: (305) 536-8220 / F: (305) 536-8229

Adam M. Moskowitz, Esq.
Florida Bar N. 984280
amm@kttlaw.com
Thomas A. Tucker Ronzetti, Esq.
Florida Bar No. 965723
tr@kttlaw.com
KOZYAK,TROPIN,&
THROCKMORTON, P.A.
2525 Ponce de Leon , 9th Floor
Coral Gables, Florida 33134
T: 305-372-1800 / F: 305-372-3508

Additional Counsel:

Jeffrey L. Kodroff
SPECTOR ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
T : (215) 496-0300

# EXHIBIT A

**Natt Reifler**                                          **James Sweeney v. Federated Retail Holdings**

---

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION
 3                    - - -
 4  James M. Sweeney, et al., )
                              )
 5        Plaintiffs, )
                      )
 6  vs.               ) Case Nos. 2:06-CV-10886
                      )          2:06-CV-10887
 7  Federated Retail Holdings, ) Hon. George C. Steeh
    Inc., et al.      )
 8                    )
         Defendants. )
 9
10                    - - -
11
12      Deposition of Natt Reifler, a defendant
13  herein, called by the Plaintiff for oral examination,
14  pursuant to the Federal Rules of Civil Procedure,
15  taken before Stacy Pace, RPR, CSR, CRR and Notary
16  Public, State of Florida, at the offices of Esquire
17  Deposition Services, on Friday, January 19, 2007,
18  commencing at 10:38 a.m.
19                    - - -
20
21
22
23
24
25
```

**2**

```
 1  APPEARANCES:
 2  On behalf of the Plaintiffs:
 3     Carolyn Kaye Ranke, Esq.
        Mary Brigid Sweeney, Esq.
 4     Brent Coon & Associates
        1220 West Sixth Street, Suite 303
 5     Cleveland, Ohio  44113
        (216) 575-7660
 6
 7  On behalf of Defendant Palmer Reifler:
 8     Michael Ashcraft, Jr., Esq.
        Plunkett & Cooney, P.C.
 9     38505 Woodward Avenue, Suite 2000
        Bloomfield Hills, Michigan  48304
10     (248) 594-8217
11
12  On behalf of Defendant Federated Retail
    Holdings, Inc.:
13
        John McManus, Esq.
14     McManus Law, P.L.L.C.
        999 Haynes, Suite 205
15     Birmingham, Michigan  48009
        (248) 642-5288
16
17                    - - -
18
19
20
21
22
23
24
25
```

**3**

```
 1                  I N D E X
 2  Testimony of NATT REIFLER
 3     Direct Examination by Ms. Ranke ............  4
 4  Certificate of Oath ............................ 142
 5  Certificate of Reporter ........................ 143
 6                    - - - -
 7
 8               E X H I B I T S
 9  Deposition Exhibit No. 1 ....................... 4
        (notice of deposition)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1     Deposition taken before STACY PACE, RPR, CSR, CRR,
 2  and Notary Public in and for the State of Florida at
 3  Large, in the above cause.
 4                    - - - -
 5  Thereupon,
 6            NATT REIFLER,
 7  having been first duly sworn or affirmed, was examined
 8  and testified as follows:
 9            DIRECT EXAMINATION
10  BY MS. RANKE:
11     Q   Would you please state your name for the
12  record and spell your last name?
13     A   My name is Natt Reifler, R-E-I-F, as in
14  Frank, L-E-R.
15     Q   Mr. Reifler, my name is Kaye Ranke, and
16  I'm one of the attorneys that represents the
17  plaintiffs in these cases.  For the record, you have
18  been provided as a corporate witness on behalf of
19  the defendant, Palmer, Reifler & Associates.  Are
20  you aware of that?
21     A   Yes.
22         MS. RANKE:  I'll mark that.
23     (Deposition Exhibit No. 1 marked for
24  identification.)
25
```

Natt Reifler                                    **James Sweeney v. Federated Retail Holdings**

---

13

1 Mr. Palmer -- well, let me ask this: Is that when
2 Palmer, Reifler and Associates was created, in 1997?
3     A    The entity that I was hired by was named
4 the Law Offices of James R. Palmer, P.A.
5     Q    And how long did you work for the Law
6 Offices of James Palmer, P.A.?
7     A    It is essentially the same entity that is
8 known as Palmer, Reifler and Associates, P.A.  He
9 changed the name at a point when he made me partner
10 or gave me permission to become a partner.
11    Q    And when was that, I guess?
12    A    Approximately 1999 or possibly 2000.
13    Q    And you said it was a Florida corporation,
14 I think?
15    A    Yes.
16    Q    Now, you indicated that you are a partner
17 in the firm.  Are Betty and Dennis also partners in
18 the firm?
19    A    No, they are not.
20    Q    So the only two partners in the firm are
21 Mr. Palmer and yourself?
22    A    Yes.
23    Q    At any point in time since 1999 or 2000,
24 have there been any other partners?
25    A    No.

---

14

1     Q    Since 1999 to present, have there been a
2 point in time when you had more than four attorneys
3 as employees of your firm?
4     A    We have several individuals that have gone
5 to law school and have graduated from law school,
6 but they are not considered attorneys licensed to
7 practice law because the school they went to was not
8 accredited within 12 months of the date of their
9 graduation.
10    Q    How -- how many of those individuals do
11 you have?
12    A    Currently in our employ, three.
13    Q    And are they at your Orlando office?
14    A    Four.  Pardon me, four.
15    Q    Are they at your Orlando office?
16    A    One is in -- in our Texas office, and
17 three are in our Orlando office.
18    Q    Can you give me the names of those people
19 in the Orlando office, those three people?
20    A    Sure.  Michael Zerulik, and it's
21 Z-E-R-U-L-I-K; James Welborn, W-E-L-B-O-R-N; Stewart
22 Bryson, B-R-Y-S-O-N.  Although Stew-- I will say
23 that when Stewart graduated from law school, it was
24 an accredited school of law, and he's currently on
25 leave while he is studying for the bar.

---

15

1     Q    Under -- I think every state is a little
2 bit different; but under Florida law, if your school
3 is not accredited, you cannot still sit for the bar?
4     A    In the state of Florida, if a school is
5 not accredited within 12 months from the date of
6 your graduation, you may not become a regularly or
7 actively practicing attorney, but you may actually
8 sit for the bar, I believe.  But they seal the bar
9 results until that -- until that time that there's
10 like a final disposition.
11    Q    How -- I mean, this is off -- far afield,
12 but how would you ever -- if there's a time limit of
13 12 months from your graduation, how would you ever
14 cure that defect?  Because once it's past the 12
15 months --
16    A    It is -- it's an unusual -- it's an
17 unusual situation.  But in this particular case, it
18 had to do with when the ABA had their meeting.
19 Their meeting was typically in, let's say, December,
20 and they failed to meet in December and instead they
21 met on January 15.  So some people missed it by like
22 15 days, and then there was a lawsuit against the
23 Supreme Court -- or there was a lawsuit that
24 ultimately, I think, was going to the Supreme Court
25 of Florida, and then a resolution ended up whereby

---

16

1 some people could go back to law school.
2     Q    Wow.
3     A    And for a shorter period of time while it
4 was accredited and you go on to take the bar.
5     Q    Wow.  That's a nightmare.
6          How many total employees do you have in
7 the Orlando office?
8     A    It is my understanding that if you include
9 temporary employees and part-time employees and all
10 full-time employees, that we currently have 90
11 employees in our office in Orlando.
12    Q    And can you give me a breakdown, just
13 generally -- it doesn't have to be specific -- of
14 how many people are full-time versus temporary or
15 part-time?
16    A    I would say -- this is an estimate, that
17 60 percent of the people would be full-time and the
18 balance would be either part-time or temporary.
19    Q    Now, in the letters that were sent that
20 are part of this lawsuit, there's also a Michigan
21 address that's identified on the letterhead, I
22 believe.  Do you have a Michigan office?
23    A    No, we do not.
24    Q    Have you at any point in time had a
25 Michigan office?

---

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

Natt Reifler                                            James Sweeney v. Federated Retail Holdings

29

```
 1    Q    Just your firm in general.
 2         MR. ASHCRAFT:  I'll just object that it's
 3    pretty overbroad.
 4         MS. RANKE:  I think I'm entitled -- I
 5    mean, they're a defendant in the case.  I think
 6    I'm entitled just to ask to get some feeling
 7    for the size of their firm.
 8         MR. ASHCRAFT:  But how -- how does the
 9    overall gross income for the firm as a whole,
10    covering all kinds of different things, how is
11    that relevant to this case?
12         MS. RANKE:  Well, they're a defendant in
13    the case, so assuming that they don't have any
14    insurance, how a judgment would be collected
15    against the firm is also relevant.  So I think
16    I'm entitled to ask generally.
17         MR. ASHCRAFT:  This isn't a debtor or
18    creditor exam.  I mean, can you break it down
19    into something more specific to the case?
20    BY MS. RANKE:
21    Q    I would like to know how much money in
22    terms of receipts that you collect on an annual
23    basis on behalf of your clients.  Just a general --
24    I'm not asking for an exact figure.  I haven't asked
25    for all of your accounting records.  Just a general
```

30

```
 1    idea, if it's $100,000, $500,000, $1 million, just
 2    to get some idea of the scope of the collection
 3    proceeds on an annual basis.
 4    A    I think that the -- the money that our
 5    firm would receive would be under $10 million a
 6    year.
 7    Q    I know in this case there's been testimony
 8    that your fee arrangement with the Lord and Taylor
 9    department store, whatever its corporate entity was
10    at any point in time, is 13 percent, I believe, is
11    your attorney agreement with them.  Does that sound
12    correct?
13    A    The contingency fee that we agreed to was
14    13 percent, correct.
15    Q    Is that a typical contingency fee
16    agreement for your firm?
17    A    It's a little low percentage in the -- but
18    it's -- you know, it's on the lower range of --
19    Q    Can you --
20    A    -- contingency.
21    Q    Can you give me a range of the type of
22    contingency fee arrangement you have with clients?
23    A    Most often they would be between 18 and
24    30 percent.
25    Q    So you don't have any arrangement that's
```

31

```
 1    more than 30 percent, and you hope not to have one
 2    that's below 13 percent; is that fair?
 3    A    I would hope that we would not have
 4    more -- any below 30.  I can't say that there's not
 5    any entity that we would do work with that might not
 6    be slightly higher than 30 percent.
 7    Q    There may be some that are higher than
 8    30 percent?
 9    A    There may.
10    Q    Okay.
11    A    It would -- it wouldn't be many, and it
12    would only be on certain, like, older files.
13    Q    Okay.  Do you have an idea -- you've given
14    me the proceeds for your firm generally.  Do you
15    have an idea of how much the gross receipts would be
16    from -- derived from the state of Michigan's work?
17    A    Much lower than -- than that.
18    Q    Do you have any idea, though, a
19    percentage-wise?
20    A    I would think during all the years that
21    we've done work for this particular client, that the
22    amount of receipts would be under a hundred thousand
23    dollars in the state of Michigan.
24    Q    Now, I also know that you work on behalf
25    of this particular client, I believe, in five states
```

32

```
 1    currently.
 2    A    That may be the case.
 3    Q    My understanding is, if I remember right,
 4    that you work in the state of Virginia, in the state
 5    of Maryland, Washington, D.C., Illinois and
 6    Michigan, are the five states that you have -- are
 7    currently under contract for with Lord and Taylor.
 8    Does that sound accurate to you?
 9    A    That sounds accurate.
10    Q    Could you give me an idea of -- and if you
11    can't give me a dollar amount, that's fine, but a
12    percentage of your firm's receipts that are derived
13    from those five states?
14    A    For Lord and Taylor?
15    Q    Yeah, for Lord and Taylor.
16    A    I would -- I mean, I would guess that it
17    would be less than one percent or less than one
18    quarter of 1 percent of our firm revenue.
19    Q    The vast majority of your attorney
20    employees are "of counsel" type arrangements,
21    correct?
22    A    I'm not sure that an "of counsel" attorney
23    is considered an employee, so that's hard for me to
24    answer.
25    Q    The vast majority of your attorney
```

**Natt Reifler**                                    **James Sweeney v. Federated Retail Holdings**

---

33

1 services that your firm utilizes are through "of
2 counsel"?
3    A   We have more "of counsel" attorneys than
4 we have employed attorneys in our -- or we have more
5 "of counsel" attorneys that we associate with than
6 attorneys that we employ.
7    Q   Do you provide a percentage with your "of
8 counsel" employees based upon the collection efforts
9 in those individual states as part of the
10 arrangement?
11   A   No.
12   Q   So it's solely the -- either the hourly
13 rate that is negotiated and agreed upon or the basic
14 monthly retainer for their services?
15   A   Correct.
16   Q   Can you give me some idea, what is an
17 average monthly -- and I know it will differ in
18 every state -- but an idea of what the monthly
19 retainer is for an "of counsel"?
20   A   A few hundred dollars a month.
21   Q   Can you give me an idea of what percentage
22 of your firm's work is involved in actual
23 litigation?
24   A   A very small percentage of our work.
25   Q   Can you tell me on average how many

---

34

1 lawsuits are filed on an annual basis by your firm?
2    A   I'd say under ten.
3    Q   A year?
4    A   Yes.
5    Q   And can you tell me if in -- I mean, this
6 is obviously just -- this is no bearing on anything
7 specifically, but did you have -- did your firm have
8 any trials in the year 2006?
9        MR. ASHCRAFT:   Rough times, or do you mean
10 trials --
11       THE WITNESS:   Trials and tribulations.
12       MS. RANKE:   I was like, what?  Sorry, I'm
13 not quick on the uptake today.  I'm a little
14 tired.
15 BY MS. RANKE:
16   Q   Trials as meaning the outcome of a
17 lawsuit.
18   A   Trials meaning the outcome of a lawsuit,
19 yes.
20   Q   In the year 2006?
21   A   Yes.
22   Q   All right.  How many?
23   A   I would say under five.
24   Q   All right.  How about in the year 2005,
25 can you give me an idea?

---

35

1    A   Honestly, I don't remember in 2005.
2    Q   Is five an estimate that you feel
3 comfortable with giving me as an average on an
4 annual basis?
5    A   There have been some years where we
6 haven't filed any lawsuits.
7    Q   Okay.
8    A   So it's hard -- it is hard to make an
9 estimate like that.
10   Q   Okay.  Can you tell me in the -- in the
11 roughly five you are indicating from the year 2006,
12 can you give me a breakdown of what types of cases
13 those five trials resulted from?
14   A   Your question earlier was that a trial
15 meant or was equal to an outcome of a lawsuit.  So I
16 want to make it clear that I didn't say that we were
17 involved in a trial as in a trial with a jury
18 necessarily or even with -- a hearing with a judge,
19 because sometimes a lawsuit can be filed and there
20 could be a default judgment and then there can be an
21 outcome.
22   Q   Okay.  Well, I'm assuming that if you
23 filed ten lawsuits, all right, let's say, on
24 average, that there was some type of result or
25 outcome to all ten of those lawsuits, whether they

---

36

1 be dismissed, default or some type of resolution.
2 So when you indicated five, I did mean -- I did
3 understand you to mean like an actual trial as in
4 the end result of a lawsuit.
5        Did your firm have any trials in the sense
6 of a hearing, a contested hearing before a judge or
7 jury in 2006, to your knowledge?
8    A   I'm not aware.  I'm -- I don't know.
9    Q   And of the five, then, circumstances that
10 you estimated when I asked you the question about a
11 trial, what would those five circumstances relate
12 to, in your mind?
13   A   Okay.  I --
14   Q   Default, default judgments?
15   A   I'm listening and I understand your
16 question.  But my understanding -- I think I
17 responded that it was -- it was less than five, not
18 that it was --
19   Q   Okay.
20   A   -- five.  But there have been some clients
21 that have asked us to filed suit, and it's my
22 understanding that we have file suit and that there
23 have been outcomes such as default judgments against
24 individuals that failed to respond to the pleadings
25 that we filed and served upon them.

---

Natt Reifler                                        James Sweeney v. Federated Retail Holdings

---

37

1    Q    If you can, tell me who are your firm's
2 five biggest customers or clients?
3    A    The largest clients of our firm, the top
4 five would probably include Wal-Mart, Kmart,
5 JCPenney, Walgreens, possibly -- it's hard to say
6 who the fifth would be.
7    Q    And when you indicate largest, are you
8 talking about in terms of number of cases to derive
9 at our top five, or in terms of overall income
10 percentages of work?
11        MR. ASHCRAFT:  I think this is getting far
12    afield and getting into proprietary
13    information.
14        MS. RANKE:  I'm not going to ask for any
15    specific amounts; I'm just trying to generally
16    figure out how he's breaking it down.
17        MR. ASHCRAFT:  Okay.  Well, I would just
18    say, so we can kind of keep on track here, I
19    think this kind of thing is something that I
20    can make objections on proprietary information
21    and all that kind of stuff.  I don't want to do
22    that to interrupt your examination, but if
23    we're getting off in these kinds of things, I'm
24    going to have to.
25        MS. RANKE:  I don't -- I'm not planning on

---

38

1    staying on this line.  I just am trying to get
2    some, again, background as to the nature of the
3    firm.
4        MR. ASHCRAFT:  Well, I think you've done a
5    good job of doing that, but now getting into
6    specific largest clients of the firm is getting
7    into stuff that's more proprietary as opposed
8    to getting a good feeling for the makeup of the
9    firm, the type of work they do, et cetera.
10        MS. RANKE:  Are you going to instruct him
11    not to answer that question?
12        MR. ASHCRAFT:  I'm not going to do that at
13    all.  I'm just saying I hope we don't go down
14    this -- this road that I would have to say, you
15    know, we can't go down this road any longer.  I
16    don't want to do that.
17        MS. RANKE:  I understand.
18        MR. ASHCRAFT:  Okay.
19 BY MS. RANKE:
20    Q    I just want to get a feel from -- my
21 question specifically is:  When you talk about your
22 top five, are you talking about in number of cases
23 or number of assignments, or are you making the idea
24 of top five based upon income derived, or they may
25 be one and the same?

---

39

1    A    They often correlate.  So in many
2 respects, they could be both in the number of
3 placements as well as the overall amount of revenue
4 that could be generated or might be collected for
5 them.
6        MS. RANKE:  Let's take just like a
7    five-minute break.
8        (Brief recess.)
9 BY MS. RANKE:
10    Q    Part of this case involves your collection
11 efforts in -- in the state of Michigan, so I would
12 like to know how many clients your firm currently
13 conducts civil recovery methods for in the state of
14 Michigan.
15    A    It's hard for me to estimate, but I would
16 imagine the top four that we mentioned earlier
17 probably all have stores within the state of
18 Michigan.  I know Lord and Taylor has at least a few
19 stores in the state of Michigan, and I quite
20 honestly do not know what other retailers do have
21 stores in the state of Michigan.
22    Q    Do you know, in terms of your firm's
23 overall work, what percentage of your work is done
24 in the state of Michigan?
25    A    Let's see.  What do we have, 50 -- or 52

---

40

1 states in the United States?
2    Q    51 counting Puerto Rico, I believe.  I
3 don't know that there's a lot of retailers in Guam,
4 but I could be wrong.
5        MR. ASHCRAFT:  Or American Samoa.  I mean,
6    we can go on and on in this.
7        MR. MCMANUS:  They don't count Iraq.
8        MR. ASHCRAFT:  That's right.
9        THE WITNESS:  Some -- some states have
10    larger population centers and it -- the number
11    of cases or the number of -- yeah, the number
12    of cases that our firm -- because as we talked
13    about, we do send letters in many states
14    throughout the United States.  The number of
15    letters that we would send in the state of
16    Michigan would be no -- no larger than -- well,
17    I think it would be proportionate to the number
18    of people in the state of Michigan versus the
19    populations of other states, because --
20 BY MS. RANKE:
21    Q    Let me --
22    A    In other words, I wouldn't want to say
23 it's just one-fifteenth of all the letters we sent,
24 because there's some large cities in the state of
25 Michigan that might move its population up higher on

---

24 of 56

**Natt Reifler**                    **James Sweeney v. Federated Retail Holdings**

41

1 a pro rata scale than some other states that have
2 the low population centers. A low population center
3 would be somewhere like South Dakota or North Dakota
4 or Montana.
5    Q    Is there in your -- in your experience,
6 are there certain states where the laws are more
7 favorable to your work than others?
8    A    Yes.
9    Q    All right. Can you give me an idea what
10 you consider Michigan; to be more favorable, less
11 favorable? Can you give me some idea?
12    A    I would say it's fair to midland.
13    Q    What is the most favorable state for civil
14 recovery purposes?
15    A    Because I am licensed to practice in
16 Florida, and our law firm is based in the city of
17 Orlando, which is in Florida, and the statute in the
18 state of Florida is rather broad in terms of its
19 definition of what is encompassed within the
20 definition of theft including theft of services,
21 theft of cash, theft of property and its actual
22 civil penalty, I think that Florida is one of the
23 more favorable states for our firm to collect in for
24 civil recovery purposes.
25    Q    For purposes -- I'm familiar with

42

1 obviously the Michigan statute because it's the
2 subject of this case, but for purposes of
3 comparison, can you tell me what are the -- the
4 civil amounts that are set in the state of Florida?
5    A    Yes.
6    Q    What are those damages? I mean --
7    A    In the state of Florida, under Florida
8 Statute 772.11, an individual that is injured by any
9 violation of a series of statutes may bring a claim
10 for three -- and those statutes are 812.012 through
11 812.037 -- may bring a cause of action for
12 three-fold actual damages and in any case $200. The
13 statute also allows for recovery of attorneys' fees.
14    Q    Do certain states specify the type of
15 theft or distinguish the type of activity that gives
16 rise to civil recovery?
17    A    Yes, some statutes are more specific than
18 others in terms of what specific actions would give
19 rise to civil recovery.
20    Q    Can you tell me if you consider the
21 Michigan statute, again, in your experience, to be
22 more restrictive in terms of its definition of what
23 gives rise to civil recovery?
24    A    With respect to all other states?
25    Q    Yes.

43

1    A    It's hard to categorize because there are
2 many -- there's so many different factors, even
3 limiting -- even limiting it to the specific
4 actions, I would say it's probably a little tougher
5 than average.
6    Q    It's a little more restrictive in terms of
7 how they define what gives rise, is that what you're
8 saying?
9    A    Yes.
10    Q    What percentage of your civil recovery
11 efforts derive from shoplifting?
12    A    Well, the majority of our civil recovery
13 efforts are derived from shoplifting.
14    Q    Okay. And if I understood you earlier,
15 you said the majority of your work involves civil
16 recovery, as a firm?
17    A    That's -- that's correct.
18    Q    So in addition to -- just so we're
19 clear, because I understand some hesitancy, and I'm
20 not trying to trap you, but you're -- you're
21 distinguishing like employee theft and, again, those
22 other types of efforts, correct?
23    A    Correct.
24    Q    Okay. And you don't consider shoplifting
25 in the same category as employee theft?

44

1    A    Sometimes it can be in the same category,
2 but most often I distinguish it because of the idea
3 of a civil recovery statutory penalty being
4 different than -- an employee theft claim
5 whereby we were asking for restitution.
6    Q    Okay. If you would define for me what the
7 difference is, in your expertise, between
8 restitution and civil recovery.
9    A    My understanding, the legal nature of
10 restitution would be the repayment of money to make
11 the aggrieved party whole. What was the other
12 question?
13    Q    Civil recovery.
14    A    Civil recovery in the industry can be
15 thought of as including any type of civil damage
16 demand related to theft, but is most often
17 associated with statutory civil penalty damages
18 associated with theft, whether it be internal or
19 external.
20    Q    And that is independent of any restitution
21 amounts claimed?
22    A    Correct.
23    Q    We've talked about Lord and Taylor, and I
24 neglected to ask you, but does your firm do -- I
25 should say has -- has your firm done civil recovery

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

Natt Reifler                                      James Sweeney v. Federated Retail Holdings

1 to the civil recovery field?
2    A    Yes.
3    Q    All right. What type of analysis does
4 your firm do prior to engaging in working in a new
5 state -- or in any state, rather?
6    A    We keep abreast of the current state of
7 law by reading the individual statutes, researching
8 whether or not there has been any case law president
9 or case law interpreting the statutes, and often
10 will consult with the potential -- or "of
11 counsel" attorney, or other attorneys in that state,
12 to determine whether there are any other
13 requirements that we are not aware of.
14    Q    Do you belong to any services, like
15 Westlaw or anything that report -- such as Westlaw,
16 as an example --
17    A    Yes.
18    Q    -- that belong or report on cases
19 involving civil recovery?
20    A    Yes, we do.
21    Q    And what are those services that you
22 utilize?
23    A    We currently use Westlaw, which is an
24 online database and legislative research service.
25 In the past we've used LexisNexis and sometimes

1 we -- we may still use LexisNexis. And we may have
2 used some third-party research entities at some
3 point.
4    Q    Is there a -- a special grouping of --
5 under Westlaw that you can identify, like as a niche
6 civil recovery? Is there -- do they break it down
7 in that way?
8    A    I'm not aware that Westlaw lists civil
9 recovery as a niche. However, they do have a
10 legislative alert -- advanced legislative alert
11 service that we subscribe to, that allows our firm
12 to enter individual state statutes or statutes of
13 interest into "to be alerted" as to any potential
14 changes in the status of the law.
15    Q    So you just plug in the statute number,
16 and then any legislative changes or cases that are
17 reported with regard to that statute, you get an
18 alert from?
19    A    Correct.
20    Q    When you're picking your outside
21 counsel -- or "of counsel" -- are there particular
22 qualifications that you look for in those attorneys,
23 like practice in these areas, or just someone that
24 you can work out some kind of arrangement with?
25    A    Well, typically we would want to make sure

1 that an individual, one, had an interest in this
2 area of law, was a licensed -- actively licensed
3 attorney to practice in the individual area, did not
4 have any other -- or any conflicts of interest in
5 terms of their field or practice; and we would spend
6 time interviewing them on the phone to make sure
7 that we felt that they would understand and be able
8 to represent our clients' interests well.
9    Q    Obviously, I canceled myself out from this
10 arrangement because I now have a conflict, but are
11 the majority of your "of counsel" people solo
12 practitioners, firms? Is there any -- can you
13 generalize that for me?
14    A    Well, the majority are not firms, so I
15 would say that more often than not they would be
16 solo practitioners, and that helps decrease the
17 likelihood or they're -- or they would be working in
18 a smaller firm setting, because that is more likely
19 to decrease the likelihood of a conflict of interest
20 or to interfere with their current commitments at
21 another firm. Many large firms will prohibit an
22 individual from doing outside work other than their
23 traditional field.
24    Q    Are there a lot of cases that -- since
25 you've been doing this, that have been -- reported

1 cases that have been -- that have occurred with
2 regard to challenging civil recovery efforts?
3    A    I would not say there are a lot, no.
4    Q    Are you aware -- for example, are you
5 aware of any cases that have challenged the civil
6 recovery statute in the state of Michigan?
7    A    Oh, in the state of Michigan? No, I'm
8 not, other than -- unless you have done so in this
9 complaint, but I'm not aware that you have.
10    Q    We don't have -- we don't have a reported
11 decision yet, so no; we just have a case.
12       MR. ASHCRAFT: Well, that -- okay.
13       THE WITNESS: I am not aware of --
14       MR. ASHCRAFT: The question was, that
15    "challenged" it. So I think Mr. Reifler was
16    thinking someone who was taking --
17       MS. RANKE: Oh, okay, I understand what
18    you're saying.
19       MR. ASHCRAFT: -- the mission to task, not
20    necessarily reported cases.
21       MS. RANKE: All right.
22       MR. ASHCRAFT: I just didn't want you
23    thinking he was being flip. He --
24       MS. RANKE: No, no. Yeah, I understood
25    that.

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

Natt Reifler                                    **James Sweeney v. Federated Retail Holdings**

53

1 BY MS. RANKE:
2    Q    In this particular case there is -- there
3 was an individual by the name of David O'Brien that
4 signed the letters. Are you aware of that?
5    A    I'm aware that he was their "of
6 counsel" attorney in the state of Michigan in the
7 past, yes.
8    Q    Can you tell me who entered into the
9 relationship with David O'Brien?
10    A    It would have either been me or James
11 Welborn from our office.
12    Q    And James Welborn is one of the people you
13 identified earlier who went to law school but is not
14 an attorney because of the weird circumstances?
15    A    Correct. He has a J.D. and he graduated
16 from law school and he's a -- he's an individual at
17 our office that serves in a capacity whereby he is a
18 manager.
19    Q    Okay. Are there people within your firm
20 whose job it is to work with the outside "of
21 counsel" and supervise them or their work?
22    A    Yes, that would be part of -- part of
23 the -- one of the functions that James Welborn does
24 in our firm. It's also one of the functions that I
25 do at our firm.

54

1    Q    What -- what level of supervision --
2 describe for me what level of supervision is
3 typically occurring between your firm and your "of
4 counsel".
5    A    Do you mean supervision by the "of
6 counsel" attorneys of our firm or our firm of them?
7    Q    Your firm of them.
8    A    Okay. Well, I will say this, that our
9 firm sends the demand letters from our Orlando,
10 Florida office, with the approval of our "of
11 counsel" attorneys.
12    Q    How is that approval process generally
13 conducted?
14    A    At the time that we initially -- or
15 initiate our communications with the "of
16 counsel" attorneys and enter into a relationship, we
17 prepare and show them a proposed demand letter and
18 series of demand letters that we would like to send
19 on behalf of retail clients, specifically in the
20 civil recovery and employee restitution arena, and
21 have them review those.
22         And if they do any type of criminal
23 defense or any type of work where there's potential
24 conflict, they often will request that we would send
25 a listing of the opposing parties' names prior to

55

1 the sending of the demand letters. And at that
2 point the -- as long as there's no conflict, then we
3 would send demand letters under their signature from
4 the state of Florida.
5    Q    Other than the initial showing of the
6 letter and potentially the list of names, do you
7 routinely provide your "of counsel" with copies of
8 the letters that are being sent?
9    A    It would depend on the individual "of
10 counsel" attorney.
11    Q    Some people require that you provide them
12 with copies?
13    A    Some people may request that they -- that
14 a letter or the information contained in the letter
15 would be transmitted to them.
16    Q    Do you routinely provide your "of counsel"
17 with updates on how many letters that are being sent
18 under their name either in a week or month's time?
19    A    No.
20    Q    Can you give me an idea of what type of
21 communication is typical between your firm and an
22 "of counsel" on either a week or monthly basis?
23    A    Some "of counsel" attorneys are more
24 actively involved than others and request more
25 information or -- and/or happen to be involved in

56

1 more follow-up on individual files.
2         Some are more interested in -- if we
3 receive an attorney phone call and the person
4 specifically requests or demands to speak with that
5 "of counsel" attorney, I would typically E-mail the
6 individual "of counsel" attorney or get on the phone
7 and speak with them, and ask them to follow up with
8 the individual if I was not able to work out
9 something with the opposing attorney.
10         The -- so it can vary. And you know, we
11 have some where we communicate every week or once
12 every two weeks or -- and some where we may not hear
13 from them as much.
14    Q    So generally the -- the majority of the
15 work and communication between the subjects of the
16 letters, let's say, just for general purposes, and
17 attorneys or your firm is conducted from the Florida
18 office?
19    A    That is right.
20    Q    Do you recall specifically who hired David
21 O'Brien, hired or negotiated some type of
22 arrangement?
23    A    Right. It would have either been myself
24 or James Welborn with me supervising. I often would
25 be involved in -- he may be involved in reviewing

Natt Reifler

**James Sweeney v. Federated Retail Holdings**

61

1    Q    Can you give me -- and you may not be able
2 to do this either, but can you give me an idea of
3 how many letters are sent out by your firm in
4 general, on a weekly basis, let's say?
5    A    Can we do it on a monthly basis?
6    Q    Sure. Monthly, however is easier for you.
7    A    It's a little easier for me. This could
8 be any type of letter which could include a release
9 letter after someone has already paid or a letter --
10 you know, a follow-up confirming a payment
11 arrangement --
12    Q    Okay.
13    A    -- things of that nature. It is my
14 understanding that we send between -- and this is in
15 the year 2007 now -- 80 and a hundred and 20,000
16 letters in a month.
17    Q    And again, you may not be able to do this
18 but if this helps you, would you be able to tell me
19 that 10 percent, 5 percent, 1 percent of that is
20 sent in the state of Michigan on a monthly basis?
21    A    I'd like to know the population size in
22 the state of Michigan in relationship to the rest of
23 the individual states. It's -- it's hard to
24 estimate that, but I don't think it's -- I can't see
25 it being more than a few percent.

62

1    Q    Okay. Do you have defined methods for
2 reviewing the work of your "of counsel"?
3    A    Most of the work in the civil recovery
4 field is actually done from our office in Orlando,
5 Florida. And -- but when an "of counsel" attorney
6 is asked to get involved in an individual file or
7 the -- or the "of counsel" attorney asked to be
8 involved in an individual file because they have
9 been contacted by an opposing party or the
10 opposing party's attorney, we would communicate,
11 much as many other attorneys would communicate with
12 each other, by phone and E-mail for follow-up,
13 attaching copies of letters that we're either
14 proposing to send or carbon copying.
15    Q    Do you have any defined way of evaluating
16 the performance of "of counsel," or is that not
17 really necessary, given the nature of your work?
18    A    I wouldn't want to say whether or not it's
19 necessary. It's -- but because of the nature of the
20 work, it's hard -- it is hard to make an evaluation
21 of how an "of counsel" attorney is doing, because we
22 very often don't have feedback from opposing parties
23 or opposing parties' attorneys regarding their
24 discussions.
25    Q    With "of counsel," you mean?

63

1    A    That -- that is correct.
2    Q    Okay.
3    A    We would typically know when an opposing
4 party had talked with an -- with one of our "of
5 counsel," and then we would be involved at that
6 point. And so -- and most often we have
7 satisfactory performance by the "of
8 counsel" attorneys.
9    Q    And that's because most -- again, most of
10 the communication is out of Florida between the
11 subjects of the letters -- most of that
12 communication with either opposing counsel or their
13 client is all generated out of Florida, correct?
14    A    Most of it is, yes.
15    Q    Did you ever, to your knowledge, do any
16 type of performance reviews of David O'Brien, your
17 firm?
18    A    Not to my knowledge, no.
19    Q    What were the circumstances whereby David
20 O'Brien left -- or ceased to be "of counsel"?
21    A    My understanding is that he called our
22 office in calendar year 2005 and let us know that he
23 would not be able to work with our firm anymore.
24    Q    Did he provide you with a reason why?
25    A    I have a relatively brief note that he had

64

1 either chosen not to continue to practice law in the
2 state of Michigan or that he had given up his
3 practice in the state of Michigan. So I'm not
4 sure -- I really do not know the circumstances --
5    Q    Okay.
6    A    -- of that.
7    Q    Who is your current "of counsel" in the
8 state of Michigan?
9    A    Her name is Christina Lorraine.
10    Q    And do you know if Ms. Lorraine is near
11 Detroit -- the Detroit metropolitan area?
12    A    I believe she is, yes.
13    Q    Have you met personally Ms. Lorraine?
14    A    No, but I've talked with her on the phone
15 many times.
16    Q    And is she -- can you describe for me, is
17 she one of the -- the counsel that asks to see
18 letters and asks to be involved or one of the other
19 less communication types that you've described?
20    A    I know that we -- we went through and
21 reviewed letters when we -- when we initially
22 entered into our relationship. I am not -- I just
23 don't know whether or not and how often she's
24 asked -- whether she's asked to see opposing
25 parties' names or if she knows that there's not any

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272**

Natt Relfler                          James Sweeney v. Federated Retail Holdings

77

1 anyone in our office, I would try to provide some
2 sort of legal support to. And I also, of course,
3 will look at compliance issues regarding a variety
4 of matters or areas that our firm may look into for
5 representing clients.
6     Q    You -- you indicated you have the three
7 other offices -- Texas, California and Illinois --
8 that you called client service. What do you
9 consider client services that are conducted at those
10 other offices?
11    A    Phone call follow-up, report generation,
12 areas whereby we try to exceed our clients'
13 expectations to help evaluate a variety of
14 performance factors, with respect to theft claims
15 most specifically.
16    Q    Would you estimate that a large part of
17 your business is derived total from Texas,
18 California and Illinois areas, other than Florida
19 obviously, which you indicated is your largest
20 but...
21    A    Well, Florida is our office main business
22 hub. It's hard to say whether -- how much of our
23 business is generated from those individual states.
24 I think that initial contacts are most often made
25 from our office in Orlando where our client

78

1 development is located.
2        So Jeffray Welch, as the director of
3 client development, would kind of -- would be in
4 charge of overseeing new business. And then once we
5 obtain that business, we will often assign someone
6 to help field phone calls or do additional follow-up
7 separate from day-to-day individual case management.
8     Q    With regard to your activities within the
9 state of Michigan for any of your clients --
10 Wal-Mart, Kmart, Walgreens, the ones you've talked
11 about in addition to Lord and Taylor -- do you have
12 a particular person within your firm whose
13 responsibility is for compliance or those kind of
14 client services issues with regard to your Michigan
15 activities?
16    A    James Welborn and I would share the
17 responsibility.
18    Q    And what is Mr. Welborn's title, again?
19    A    He is the director of compliance, and I'm
20 not sure if there's something additional to the
21 title.
22    Q    Okay.
23    A    He used to be a senior projects manager,
24 and I think a relatively new title includes the
25 director of compliance.

79

1     Q    Now, a great deal of your work is
2 generated through the letters, as you've indicated.
3 Walk me through the process of how you determine the
4 contents of a letter.
5     A    In the state of Michigan or in --
6     Q    Tell me generally first, if you will.
7     A    Generally, okay. One, we, you know,
8 verify whether or not there is a statutory -- or if
9 there is a statute that applies to the specific
10 incident for which the retailer has asked us to send
11 a letter.
12        And then we -- depending on, one, the
13 retail client and the particular practice, we can do
14 one of several things. Sometimes we will receive a
15 file, review it to make sure that it meets not only
16 state law but the individual corporate criteria,
17 then we will somehow enter that information into our
18 computer system so that a letter could be generated
19 before it would be mailed.
20    Q    Do your clients say to you, I want you to
21 follow this procedure in doing the collection?
22    A    Some clients are more specific with their
23 requests for procedures to follow, and we -- we
24 would listen to what a client wants but always
25 tailor that with respect to the individual state and

80

1 laws of that state.
2     Q    What is your typical practice in terms of
3 the sequence of your efforts?
4        MR. ASHCRAFT: I'm sorry, what was the
5 last part of that?
6        MS. RANKE: The sequence of your efforts.
7        MR. ASHCRAFT: Thank you.
8        THE WITNESS: Once we receive a case and a
9 review has been performed -- a review could be
10 performed prior to the receipt -- and it's
11 entered into our system, a letter would be
12 mailed. Typically we give the opposing party a
13 period of time to respond to the initial
14 correspondence. After --
15 BY MS. RANKE:
16    Q    What is that time generally?
17    A    That timeframe typically ranges between 20
18 and 30 days. This is -- we're just going to narrow
19 this to alleged shoplifting attempts, let's just say
20 things that someone could be alleged to have -- if
21 they were in Michigan, could be engaged -- alleged
22 to be engaged in retail fraud of the third degree,
23 as an example. If that was the case, a letter would
24 be generated and the request would be sent.
25        Some state statutes recommend the actual

105

1 you're generally asked to perform?
2    A    Because you're -- you're limiting it from
3 2004 to 2006; and during that period of time,
4 there's probably been a changeover in terms of what
5 our scope of services for them would be. So at one
6 point we were doing follow-up letters for them
7 solely, at which point they would have already sent
8 an initial demand letter, or two or three.
9         So we would not have been doing any kind
10 of initial reviews for those types of files. And --
11 and my understanding is that they have a review
12 process internally prior to sending them to us and
13 that they've asked us to send -- when they send a
14 file, it has been reviewed and they've decided they
15 would like us to send a demand letter.
16    Q    How about Kmart?
17    A    Kmart, I believe, is similar.
18    Q    All right. How about Walgreens?
19    A    Walgreens, I am not sure of because
20 they're more of a newer client for us, and I would
21 have to review information.
22    Q    Okay. How about Lord and Taylor, what
23 kind of arrangement do you have with Lord and
24 Taylor?
25    A    It is my understanding that they -- they

106

1 have done an initial review and that they have
2 forwarded files to us -- if they were new files,
3 they would -- actually, if they were new or
4 follow-up files, they would ask us to send the
5 demand letters on them.
6         I will add that there have been times when
7 we may have not understood or seen whether or not a
8 police report has been filed, and we have made a
9 request to see whether or not it has been to get
10 clarification prior to sending the letter.
11        MS. RANKE: Okay. This might be a good
12 time to break before we go into that area.
13        (Brief recess.)
14 BY MS. RANKE:
15    Q    I want to talk to you a lot more about the
16 responsibilities that we've just been discussing;
17 however, that's another area and we're going to
18 narrow our time.
19        For purposes of understanding how
20 discovery can be completed in this case, I'd like
21 for you to describe for me the mechanics of how the
22 communications work in terms of transporting the
23 files.
24    A    Okay. It's my understanding that we
25 receive the files electronically. And you're

107

1 talking about Lord and Taylor in this case?
2    Q    Yeah, specifically.
3    A    Yes, my understanding is that we receive
4 the files through an electronic means, whether it be
5 an Excel spreadsheet or a file transfer through like
6 an internet FTP site.
7    Q    So in other words, like a posting
8 of files on an FTP site, and you go and download
9 them down into your system?
10    A    Right. Because I think that they may --
11 from Lord and Taylor, they may either currently or
12 have in the past come through either or both of
13 those methods.
14    Q    Okay. What type of computer system does
15 your firm utilize?
16    A    Our computer system? We have -- well, we
17 have a proprietary software system that's Microsoft
18 based.
19    Q    Okay.
20    A    And we have, you know, several -- we have
21 programmers that have developed the -- the program
22 for it. And that's what it is.
23    Q    Okay. Do you use Word or WordPerfect or
24 Excel in terms of your -- in addition to your
25 proprietary operating system?

108

1    A    I mean, just in the day-to-day function of
2 our law firm?
3    Q    Yes.
4    A    Certainly. I mean, I write letters in
5 Word quite often. I also sometimes create
6 spreadsheets or have people in our office that also
7 create spreadsheets internally. Sometimes we'll use
8 them and -- and use those. We also have like other
9 report writers that will help us configure data for
10 clients and ourselves.
11    Q    How -- how do you track cases?
12    A    In what sense? I just --
13    Q    Well, in terms of, do you have a system
14 that automatically sends you a follow-up like -- by
15 individual file, like the first letter was sent on
16 this day and you get an alert or someone gets an
17 alert to say it's now the 32nd day?
18    A    No. I mean, the system -- well, there
19 could be individual files where somebody might on
20 their own individual, let's say, Outlook program do
21 a calendar follow-up --
22    Q    Right.
23    A    -- hey, call back to somebody. But on an
24 individual civil recovery file to which there was no
25 response to an initial letter, our system has

164

1  reasonable and correct amount that they
2  should.
3  Q. Correct. Is it your testimony
4  that the only time a civil recovery
5  adjustment would be made is if the
6  client asked you to?
7  A. No. Actually, I'm not sure.
8  There might be other reasons that the
9  IT department may have put that field
10 in there for other instances. For
11 example, if the initial demand amount
12 requested would not perform through a
13 calculation, like a mathematical
14 calculation by our firm but rather from
15 a client that there might be an
16 adjustment made from our side, from our
17 law firm, to reduce the amount down to
18 an amount that we felt was either
19 appropriate or per agreement.
20 Q. Why don't --- you agree that
21 we're not going to go over all the
22 items that we went through in your
23 original deposition. Why don't you
24 walk me through the process that your
25 firm utilizes to determine what is the

165

1  appropriate amount to send out in the
2  initial letter and what information you
3  utilized to make that determination?
4  A. Okay. Is this narrowed to the
5  State of Michigan?
6  Q. Yes. Just in the State of
7  Michigan.
8  A. Okay. First, it is dependent on
9  ---.
10 ATTORNEY ASHCRAFT:
11 Hold on for one second.
12 Narrowed to Lord and Taylor in
13 the State of Michigan?
14 BY ATTORNEY RANKE:
15 Q. For this purpose right now,
16 narrow it to Lord and Taylor.
17 A. Okay. Yeah. I mean, I think
18 that we did go over some of this during
19 my deposition. But it's my
20 understanding that the client, Lord and
21 Taylor, sends us a report making a
22 request for the demand amount that we
23 will be asked to make in the State of
24 Michigan, and we verify those
25 through our office and specifically Liz

166

1  Perez is the initial person from our
2  data entry department that reviews the
3  spreadsheet and/or electronic
4  information sent from Lord and Taylor.
5  And at that point we prepare demand
6  letters based on that information.
7  Q. All right. So it's your
8  testimony that you receive the
9  electronic file from Lord and Taylor
10 which contains some abbreviated form of
11 the incident report. That's the first
12 contact; correct?
13 A. Correct.
14 Q. And based upon that information,
15 Lord and Taylor document what they want you to request
16 document what they want you to request
17 in a civil recovery sense?
18 A. Yes, that's my understanding.
19 Q. Okay. So in other words, Liz
20 Perez gets a file, an electronic file,
21 that says here's the incident report
22 from this day, and send out --- I'm
23 instructing you to send out a civil
24 recovery letter in the amount of $200,
25 or whatever the appropriate amount is?

167

1  A. We receive the information, and
2  I think that some of the information
3  includes such things as the dollar
4  amount of the retail theft. And based
5  on that information, a demand letter is
6  prepared.
7  Q. Okay.
8  A. And sometimes it's actually sent
9  --- it could be either through Liz
10 Perez or through our IT department,
11 through Gary Hinden's department.
12 Q. Okay. I'm trying to get a
13 sense, and I'm not trying to be
14 difficult. But I'm trying to really
15 understand who it is that calculates
16 the amount. And you've answered
17 generally and you said if there's a
18 mathematical formula that our office
19 calculated or didn't, and I'm trying to
20 understand how this happened with
21 regard to your relationship at Palmer
22 Reifler and Lord and Taylor
23 specifically, okay. When an incident
24 report is sent to you that starts the
25 process, who determines the amount that

176

1  additional business, and some of that
2  included Michigan business, yes.
3  Q. Okay. And two types of cases
4  were given to you with regard to Lord
5  and Taylor in the State of Michigan,
6  one being initial demands from the
7  moment that the incident happened;
8  correct?
9  A. Well, it looks like from this
10 report, most of these are initial
11 incidents. But, yes.
12 Q. And then secondly follow-up on
13 cases that there has been no recovery?
14 A. I'm not sure whether in the
15 State of Michigan whether we were only
16 doing the initial collection. I mean,
17 I should say collections from the
18 start, or if we were also receiving
19 collections as a follow-up for Lord and
20 Taylor in Michigan. In some states
21 that we did business for Lord and
22 Taylor, we were doing follow-up only,
23 and in other states, I think we were
24 doing just the --- I mean, the initial
25 collections from start to finish, so to

177

1  speak.
2  Q. Well, I have a lot of questions
3  with regard to how you do work on ---
4  behalf of other clients in the State of
5  Michigan, and I may have questions with
6  regard to how you do things for Lord
7  and Taylor in other states that
8  everyone may have some objections to.
9  But right now, I want you to answer
10 your questions with regard to what your
11 firm does on behalf of Lord and Taylor
12 in the State of Michigan only, okay?
13 You understand?
14 A. Yes.
15 Q. Okay. Can you tell me as of
16 your beginning to do additional work on
17 behalf of Lord and Taylor, that I
18 believe is sometime in October of 2004,
19 can you tell me what you do on behalf
20 of Lord and Taylor in the State of
21 Michigan?
22 A. From the time in 2004 when we
23 started doing work with them?
24 Q. Until now, yes.
25 A. Until now. We send demand

178

1  letters on their behalf. And I believe
2  that the majority of the demand letters
3  we send for them in the State of
4  Michigan would be the --- where we
5  would begin soon after the incident and
6  do the entire collection process for
7  them.
8  Q. You answered earlier some
9  information about follow-up from third
10 party --- and I don't know what you
11 called them. Third party entity. What
12 is that third party you were referring
13 to?
14 A. Well, a civil recovery company,
15 and I think in our last deposition you
16 brought up the name Zelman, and you
17 asked us if they were a competitor and
18 I said yes. And I think that was the
19 name that you brought up. So that is
20 an entity that would do --- well, could
21 also do initial collections for Lord
22 and Taylor.
23 Q. Is it your understanding that
24 you have done or are doing follow-up to
25 what Zelman or another third party

179

1  entity had previously attempted on
2  behalf of Lord and Taylor in the State
3  of Michigan?
4  A. I am not sure about that.
5  Q. Okay.
6  A. I do not know.
7  Q. Okay. But that is something
8  that you do on behalf of clients?
9  A. Right.
10 Q. Okay.
11 A. I mean, there is a good chance
12 that we are.
13 Q. Okay. You just don't remember
14 specifically?
15 A. Correct.
16 Q. Okay. Now, getting back to how
17 the information is supplied to your
18 firm from Lord and Taylor, all right,
19 can you tell me what kind of
20 information would be contained in the
21 spreadsheet that you said you received
22 from Lord and Taylor?
23 A. Yes. There would be generally
24 the store number that would indicate
25 what state that the --- yeah, the

Natt Reifler - Vol. II                    James Sweeney v. Federated Retail Holdings, Inc.

180

1  incident took place in, the theft
2  amount, the requested demand amount,
3  the age of the individual as in date of
4  birth calculated from, I would imagine,
5  the date of the incident.
6  Q. I'm sorry, what?
7  A. Well, it would either say the
8  age or it would say the date of birth.
9  Q. Of the suspected person?
10 A. Right.
11 Q. Okay.
12 A. And then possibly that would be
13 in the report. Possibly any other
14 identifying information, such as if
15 there was a Social Security number
16 and/or driver's license, the address
17 that the individual provided at the
18 time of the incident, the last name of
19 the individual, sometimes the middle
20 initial or middle name of the
21 individual, and the first name or a
22 first initial of the individual. And I
23 am not aware whether --- I don't
24 believe that we receive a separate
25 narrative along with that information

182

1  A. That is correct. In different
2  states there are different
3  requirements. And sometimes there's a
4  different level of liability, but you
5  did ask me the questions specifically
6  to the State of Michigan. But minors
7  are --- parents of minors. It has to do
8  with the question of who is liable
9  under the individual statute. And some
10 states may have joint and several
11 liability between the minor and the
12 parent. Some states will make it ---
13 the liability on the parent and/or
14 guardian of the minor. Sometimes it
15 could be on the minors themselves.
16 Q. And obviously, that's to know
17 who to send your letter to? That's the
18 purpose of supplying that information;
19 correct?
20 A. Correct.
21 Q. All right. And do you know in
22 Michigan specifically whether or not
23 you have joint and several with the
24 parent and the minor, or just the
25 parent? Do you know what to answer to

181

1  in the State of Michigan for Lord and
2  Taylor. There may be other
3  information, but that is what I can
4  think of right now.
5  Q. Okay. We talked about the
6  report that is attached to that letter
7  that we've marked as Exhibit Two.
8  That's a spreadsheet; correct?
9  A. Yes.
10 Q. That kind of report is what
11 you're calling a spreadsheet?
12 A. Yes.
13 Q. And it's your testimony that
14 what you receive, or your firm, and I
15 know not you personally, but your firm
16 receives from Lord and Taylor is some
17 kind of report that is in spreadsheet
18 format that has that information you
19 just gave me?
20 A. Yes.
21 Q. Okay. Obviously, the age of the
22 individual and the date of birth is
23 important because there are differences
24 in what you can do on behalf of minors;
25 is that correct?

183

1  that fact scenario in the State of
2  Michigan?
3  A. It's my understanding that the
4  statute speaks in terms of liability
5  for the parents and guardians of a
6  minor child.
7  Q. But not the minor child
8  themselves?
9  A. That is my understanding, yeah.
10 Q. Okay. Then you indicated that
11 the report says an address provided,
12 and again, that's to know where to send
13 the letter; correct?
14 A. Right. I know we had a city and
15 a state. I'm not sure ---.
16 Q. I guess that's part of an
17 address, I would assume.
18 A. Yes.
19 Q. All right. And so the purpose
20 of the spreadsheet is to say here's
21 where we want you to direct your
22 letters to, and here's the information
23 that you need in order to send out that
24 letter. Is that kind of a fair
25 statement?

Natt Reifler - Vol. II                          James Sweeney v. Federated Retail Holdings, Inc.

252

```
1   letters for shoplifting cases by our
2   firm with retailers are all on a
3   contingency basis. So we don't have a
4   separate billing time associated with
5   our of-counsel attorneys.
6   Q. That you give to the client?
7   A. That we charge the client,
8   right. We do not charge our client ---
9   if we have an of-counsel attorney that
10  does follow-up on a particular file, if
11  that was billed to us from that
12  of-counsel attorney separate from the
13  retainer that we had discussed, that
14  would not be passed on as a cost to any
15  client that we have.
16  Q. That's just part of your
17  contingent fee and attorney's fees that
18  you calculated into your rate quoted to
19  Lord and Taylor?
20  A. That is correct. And we do not
21  charge them for the cost of our
22  mailing, our long-distance phone calls,
23  and so forth.
24  Q. And what is the amount that you
25  pay your --- the hourly amount that you
```

254

```
1   worked over that, then they would bill
2   us. And sometimes an of-counsel
3   attorney will say, well, in fact, I
4   want to get paid --- you know, they
5   might talk and negotiate or renegotiate
6   the amount, but depending on what they
7   have to do or what type of follow-up,
8   they might send us a bill and we would
9   talk of the matter of paying it and so
10  forth.
11  Q. All right.
12  A. It would typically be
13  substantially more than that particular
14  amount for if an of-counsel attorney
15  was doing additional review for our
16  firm. They would often bill at a
17  higher rate than $100 that we paid to
18  David O'Brian at the time we hired him.
19  Q. Okay. On behalf of Lord and
20  Taylor, and I know we talked about
21  this, and now that we've had this
22  understanding with regard to your
23  specific fees and how they're
24  apportioned, have you filed a lawsuit
25  on behalf of Lord and Taylor stemming
```

253

```
1   pay your contract attorney in the State
2   of Michigan?
3   A. Well, at the time of this
4   lawsuit, we were paying David O'Brian
5   $100 per month. We probably --- and I
6   haven't double checked, but I would
7   imagine that we had hired him in, I
8   believe, 2000. And then he went
9   through to May of 2005. The retainer
10  amount that we pay Ms. Lorraine is
11  probably $150 or maybe $200 a month.
12  Q. And that's the monthly retainer
13  that we discussed earlier?
14  A. That's correct.
15  Q. But if they actually do any
16  work, you don't pay them an additional
17  hourly rate?
18  A. No, that would typically cover a
19  period of time that they would work for
20  our firm. In other words, we'd say
21  that that would include if they did an
22  hour's worth of work, for example.
23  Q. All right. That's how it's
24  calculated?
25  A. Uh-huh (yes). And if they
```

255

```
1   from an incident in the State of
2   Michigan between 2004 and 2007?
3   A. No.
4   Q. Has your law firm filed a
5   lawsuit on behalf of Lord and Taylor in
6   any state between 2004 and 2007, to
7   your knowledge?
8   A. No.
9   Q. And has your firm filed a
10  lawsuit on behalf of any client in the
11  State of Michigan between 2004 and
12  2007?
13  A. In Michigan, no.
14  Q. And this is --- I don't want to
15  go back over everything, but we talked
16  about when the attorney --- the
17  flagging of the attorney when you get
18  the initial --- if there is an attorney
19  when you receive the information from
20  Lord and Taylor.
21  ATTORNEY ASHCRAFT:
22  I'm sorry. Would you
23  ---?
24  ATTORNEY RANKE:
25  Okay.
```

# EXHIBIT

# B

# PALMER, REIFLER & ASSOCIATES, P.A.

1900 Summit Tower Boulevard, Suite 820 Orlando, Florida 32810-5951

**FLORIDA**

Post Office Box 607774
Orlando, Florida 32860-7774

**FLORIDA**

Telephone (407) 875-8032
Toll Free (888) 572-5637
Facsimile (407) 875-0239

3/14/2008

||..|||..|...||||....|..|..|..||.|.|||....||...|..|...|||..|...|..|
Parent/Guardian of RANDI JOLLIFF
1430 N. 22nd St
Allentown PA 18104-2306

Re: JCPENNEY
JOLLIFF
File: PA-1102720-JCP

Dear Parent/Guardian of RANDI JOLLIFF:

This Law Firm represents JCPENNEY concerning its claim against you in connection with an incident involving your child in their store 67 on 3/1/2008.

Pursuant to "Damages in actions on retail theft" statute, 42 Pa.C.S.A. § 8308, JCPENNEY may proceed with a civil penalty claim against you.

**You may settle this matter by making payment to us in the amount of $202.00 within twenty (20) days of the date of this letter.** Upon receipt of full payment and clearance of funds, you will receive a written release of the civil penalty claim.

**Payment should be made payable and mailed to Palmer, Reifler & Associates, P.A., PO Box 607774, Orlando, FL 32860-7774. Please include the file number shown above on your payment.** If you wish to discuss alternative payment arrangements, you may call us at (888) 572-5637. **Money Orders, Checks, MasterCard, Visa, American Express, Discover, Money Gram, Electronic Checks and Debit Cards are also accepted. Pay on-line at WWW.PALMERPAY.COM.**

Should payment fail to be made, we will review the file for the possibility of further civil action and may choose to request pre-litigation attorney's fees. Therefore, to avoid a higher demand request, please make payment in full according to the terms stated or call our office to set up suitable payment arrangements.

Yours very truly,

Harry E. Straub, Jr.*
Of Counsel for the Firm

*Only affiliate of Firm admitted in PA
HES/III

Se Habla Español

# PALMER, REIFLER & ASSOCIATES, P.A.

1900 Summit Tower Boulevard, Suite 820 Orlando, Florida 32810-5951

**FLORIDA**

Post Office Box 607774
Orlando, Florida 32860-7774

**FLORIDA**

Telephone (407) 875-8037
Toll Free (888) 577-5637
Facsimile (407) 875-0749

1-22-2008

Parent/Guardian of RANDI JOLLIFF
1340 N. 32nd St
Allentown PA 18104-2506

Re: JCPENNEY
JOLLIFF
File: PA-4-82320-JCP

## SECOND NOTICE

Dear Parent/Guardian of RANDI JOLLIFF

This Law Firm represents JCPENNEY concerning its claim against you in connection with an incident involving your child in their store 67 on 3/1/2008. You have failed to make payment after written demand to do so.

Pursuant to the "Damages in actions on retail theft" statute, 42 Pa.C.S.A. § 8308, JCPENNEY may now proceed with litigation against you.

**You may stop a lawsuit from being filed and settle this matter by making payment to us in the amount of $477.00 within ten (10) days of the date of this letter.** If you desire, you may mail up to three (3) payments of at least $159.00 each, as long as the first $159.00 payment is postmarked within 10 days of the date on this letter and the remaining two (2) payments are mailed within 30 and 60 days. Upon receipt and clearance of your full payment, you will receive a written release of the civil penalty claim.

**Payment should be made payable and mailed to Palmer, Reifler & Associates, P.A., PO Box 607774, Orlando, FL 32860-7774. Please include the file number shown above on your payment.** If you wish to discuss alternative payment arrangements, you may call us at (888) 577-5637. **MasterCard, Visa, American Express, Discover, Money Gram, Money Order, Electronic Checks and Debit Cards are also accepted. Pay on-line at WWW.PALMERPAY.COM.**

Should payment fail to be made, our client may then proceed to file a lawsuit against you, in which case our client may seek attorney's fees, court costs and other legal expenses throughout the litigation. In such case, you would be served by the Sheriff or other means, with a summons requiring you or your attorney to appear in court to defend the action. If successful in any such litigation, we estimate that our client would be seeking a final judgment of damages, attorney's fees and court costs in excess of the amount demanded herein.

Please make payment according to the terms herein to avoid such action.

Yours very truly,

Harry F. Small, Jr.*
Of Counsel for the Firm

*Only affiliate of Firm admitted in PA
HFS/JU

Se Habla Español

# PALMER, REIFLER & ASSOCIATES, P.A.

### 1900 Summit Tower Boulevard, Suite 820 Orlando, Florida 32810-5951

**FLORIDA**

Post Office Box 607774
Orlando, Florida 32860-7774

**FLORIDA**

Telephone  (407) 875-8032
Toll Free  (888) 572-5637
Facsimile  (407) 875-0239

4/23/2008

Parent/Guardian of RANDI JOLLIFF
1330 N. 22nd St.
Allentown, PA 18104-2506

Re: JCPENNEY
JOLLIFF
File: PA-4102770-JCP

## THIRD NOTICE

Dear Parent/Guardian of RANDI JOLLIFF,

This Law Firm represents JCPENNEY concerning its claim against you in connection with an incident involving your child in their store 67 on 3/1/2008.  Pursuant to "Damages in actions on retail theft" statute, 42 Pa. C.S.A. § 8308, we previously mailed a written demand for payment of $477.00 to you.  To date, you have failed to make full payment.

### THIS IS YOUR THIRD NOTICE.

We must receive payment of $477.00 within ten (10) days of the date of this letter.  If you wish, you may make up to three (3) payments of no less than $159.00 each, as long as the first payment is postmarked within ten (10) days of the date of this letter.  If you wish to discuss a different payment plan, you may call our office to do so at (888) 572-5637.

In the event our client chooses to file an action against you, either an attorney licensed to practice law in the state where the store is located or a JCPENNEY corporate representative will pursue the claim.  If our client chooses to pursue this matter in court, you would be served by the sheriff or other means with a summons which would instruct you or your attorney to respond and/or appear in court to defend the action.  If our client prevails in any such a lawsuit, we estimate that our client would seek a final judgment of damages, attorney's fees and court costs in excess of the amount demanded herein.

Please make payment according to the terms hereof to avoid such action.  **Payment should be made payable and mailed to Palmer, Reifler & Associates, P.A, PO Box 607774, Orlando, FL 32860-7774.  Please include the file number shown above on your payment.  Please be sure to keep a record of this address for future payments, as we will not provide additional payment notices.**

**Money Orders, Money Gram, Electronic Check, MasterCard, Visa, American Express, Discover and Debit Card are also accepted.  Pay on-line at WWW.PALMERPAY.COM.**

Govern yourself accordingly

Yours very truly,

Harry F. Smail, Jr.*
Of Counsel for the Firm

*Only affiliate of Firm admitted in PA
HFS:III

Se Habla Español

# EXHIBIT C

# PALMER REIFLER & ASSOCIATES P.A.

Civil Recovery
Collection Through The Law

search

| HOME | ABOUT | SERVICES | CLIENT REMARKS | LINKS | EVENTS | TERMS | CONTACT |

HISTORY    MISSION    TEAM

**OUR FOUNDER**
SENIOR MANAGEMENT

LEGAL
CLIENT SERVICES
INFORMATION TECHNOLOGY
TELEPHONE ACQUISITIONS GROUP

DATA ENTRY
ACCOUNTING & FINANCE

## JAMES R. PALMER, ESQ.
# SENIOR PARTNER AND FOUNDER



James R. Palmer has been actively involved with Civil Recovery since the inception. He successfully litigated the case *Shorts v. Palmer* that differentiated civil recovery claims from debt claims. James has researched and lectured on Unauthorized Practices of Law (UPL) as well as defenses to the Fair Debt Collection Practices Act (FDCPA). Palmer has also appeared as an expert witness before State Subcommittees investigating the civil recovery practices of non-lawyers.

For almost twenty years, James Palmer of Palmer, Reifler and Associates, P.A. has represented retailers on national, state and local issues affecting recovery of damages for theft and other retail loss challenges. Palmer, Reifler and Associates P.A. represents numerous national retail clients in all aspects of civil recovery for theft, including recovery of damages, penalties and restitution from theft offenders, structuring of retail in-house civil recovery programs, defense of claims against retailers and regulatory issues.

# PALMER REIFLER & ASSOCIATES P.A.

...asing Civil Recovery
Collection Through The Law

search

| HOME | ABOUT | SERVICES | CLIENT REMARKS | LINKS | EVENTS | TERMS | CONTACT |

HISTORY    MISSION    TEAM

 

**OUR FOUNDER**

**SENIOR MANAGEMENT**

**LEGAL**

**CLIENT SERVICES**

**INFORMATION
TECHNOLOGY**

   Gary Hinden

   Jonathan W. Frenk

   Leoraul Torres

   Daniel Hinden

   Charles L. Phillips

**TELEPHONE ACQUISITIONS
GROUP**

**DATA ENTRY**

**ACCOUNTING & FINANCE**

### SEE ALSO

- Michael Zerulik, J.D.
- Mark Hansen
- Adrian Vasquez
- Jeff Rainwater

## TOMORROW'S SOLUTIONS



At Palmer, Reifler &
Associates, P.A. we
understand that
superior results
depend on the use of
the latest in
technology. For that
reason, we invest
heavily in IT systems and the technical support to
maximize effectiveness.

In conjunction with RuMe Interactive® and its *Case
Management Software,* we offer large clients what we
have found to be the *Best in Class* data transmission and
storage solution available. At the same time however,
we are completely flexible and can work effectively with
any *in-house* or *third party* case management or data
transmission system.

Our Information Technology division features:

- Proprietary In-House Case and Letter Management
  Processes

- Electronic and Paper Case Transfers Capabilities

- Customized Client Reporting

- Automated Outbound Calling

# Palmer**PAY**.com

**Wednesday, May 07, 2008**

## Payments with Cash

**Featured Services**

Home

Pay Now

Pay with Cash

Frequently Asked
Questions

**Questions regarding your
account?
Call us at:
1.888.572.5637**

**Canada cases should
contact us
At: 1.866.213.4635**

**Outside the US & Canada?
Reach us at:
1.407.875.8032**

**Concerns or issues
regarding our Web Site?
Write us at:
info@palmerpay.com**



The Law Offices of Palmer, Reifler and Associates,
P.A. accepts cash payments through the trusted
payment and financial services of MoneyGram®.
MoneyGram® makes it convenient, reliable, and secure to make payments. Find one of
their agents in the many convenient places around your neighborhood.

**Easy as 1, 2, 3**

- Find a MoneyGram® retail agent location. Find it here or call 1-800-MoneyGram.

- At the agent location provide our company 4-digit code (5517), our company name
  and adddress, and your file number with us.

- Pay with Cash and receive payment notification at same location.

THE LAW OFFICES OF



Palmer | Reifler
AND ASSOCIATES, P.A.



Copyright © 2008 Palmer Reifler & Associates. All rights reserved.

https://www.palmerpay.com/WebPaymentsApp/default.aspx?display=cashpayment

5/7/2008



# PalmerPAY.com

Wednesday, May 07, 2008

**Featured Services**

Home

Pay Now

Pay with Cash

Frequently Asked Questions

**Questions regarding your account?**
**Call us at:**
1.888.572.5637

**Canada cases should contact us**
**At: 1.866.213.4635**

**Outside the US & Canada?**
**Reach us at:**
1.407.875.8032

**Concerns or issues regarding our Web Site?**
**Write us at:**
info@palmerpay.com



THE LAW OFFICES OF

## Palmer | Reifler
AND ASSOCIATES, P.A.



## Welcome

**Mailing Your Payments**

To make payments send us a check or money order, and please make sure you include your file number on the payment and make it payable to:

Palmer, Reifler and Associates, P.A.
P.O. Box 607774
Orlando, FL 32860

A portion of Palmer, Reifler & Associates, P.A. representation concerns the collection of consumer debt. Therefore, if applicable, this communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.

**Payments Online**

You can pay us also online. This site was designed in order to provide an easy and secure method in which to pay your penalty.

By choosing to pay via credit/debit card or with your bank/check account, there will be a $12.50 convenience fee added to each transaction. Payments made on this web site are not refundable.

---

We hope this site will make it easier for you to resolve your matter. If you have any questions regarding your account, feel free to contact us at (888) 572-5637 and one of our representatives will be glad to assist you.

Copyright © 2008 Palmer Reifler & Associates. All rights reserved.

# EXHIBIT

# D



**BUREAU OF
CONSUMER PROTECTION**

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

August 27, 1992

James R. Palmer
Garfinkel & Palmer
Tower Place at the Summit
1900 Summit Tower Boulevard
Suite 760
Orlando, Florida  32810

Dear Mr. Palmer:

This is in response to your request for a staff opinion concerning the Fair Debt Collection Practices Act ("FDCPA" or "Act"). I apologize for the delay in responding. As I told you on the telephone today, I was not certain from your two letters whether you sought a written reply if Commission staff agreed with your analysis of the Commission Staff Commentary on the FDCPA ("Commentary"). Because I now know that you would like such a written response, I am sending this informal staff opinion.

You ask whether your retailer clients or your law firm would be covered by the FDCPA if they "make[] a claim for civil damages against an alleged shoplifting offender." Retailers, to the extent that they are creditors, are not covered by the FDCPA. Under certain circumstances, however, your law firm would be covered by the Act. The central issue is whether your retailer clients' claims for civil damages are "debts" for purposes of the FDCPA.

The FDCPA defines "debt" as

any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

The Commentary states that the definition of "debt" does not include tort claims "because they are not debts incurred from a [transaction] (involving purchase of) property ... or services ... for personal, family or household purposes." (The Commentary contains a typographical error, using the word "transportation" where the word "transaction" was intended.)

When I spoke with you today, you stated that all of the civil claims brought by your retailer clients against alleged shoplifters are tort claims. These claims are not "debts" as the term is defined in the FDCPA. Thus, when your law firm attempts

James R. Palmer
August 27, 1992
Page 2

to enforce the claims, it is not attempting to collect "debts,"
and its collection activities with respect to these claims are
not covered by the FDCPA.

The views expressed herein represent an informal staff
opinion. As such, they are not binding on the Commission. They
do, however, reflect the staff's current enforcement position.

Sincerely,

Thomas E. Kane
Attorney
Division of Credit Practices

# EXHIBIT E



**Federal Trade Commission**
Protecting America's Consumers

# THE FAIR DEBT COLLECTION PRACTICES ACT
## at the
## FEDERAL TRADE COMMISSION

"A Creditor is worse than a master;
for a master owns only your
person, a creditor owns
your dignity, and
can belabour
that"(1)

### MARY L. AZCUENAGA

### COMMISSIONER
### FEDERAL TRADE COMMISSION

### before the

### CALIFORNIA ASSOCIATION OF COLLECTORS
### The Universal Sheraton Hotel
### Universal City, California

### May 17, 1994

### Remarks Before
### the
### California Association of Collectors

### May 17, 1994

I am delighted to be here today to discuss the Fair Debt Collection Practices Act and the FTC's program to enforce this important statute. Let me begin by offering a disclaimer: the views I express today are my own and not necessarily those of the Commission or any other commissioner.

I would like to give you an overview of the Fair Debt Collection Practices Act and to do that I plan to cover four areas: First, I will briefly give a background of the law; second, I will address separately the legal responsibilities of debt collectors, attorney collectors, and creditors under the law; third, I will attempt to provide you with an overview of enforcement and other activities recently conducted by the Commission to remedy debt collection practices that violate the Act; and finally, I will report on several recommended legislative amendments that the Commission has proposed to Congress to improve the effectiveness of the Act.

## I. BACKGROUND

### A. The Statute

The FDCPA prohibits abusive, deceptive and unfair debt collection practices, and it imposes certain affirmative duties on debt collectors. Congress enacted the FDCPA in response to what it saw as an increasing incidence of consumer abuse by debt collectors. This abuse included practices that appeared designed to inflict severe emotional distress and otherwise to injure consumers by invading their privacy, damaging their reputations and intimidating them into taking actions they might not have been obligated to take. Frequently reported tactics included:

- Sending purported debtors phony legal documents threatening court action to force payment;

- Harassing debtors at home and at work with multiple calls in short periods of time;

- Impersonating attorneys, policemen and other authority figures; and

- Threatening bodily harm or even death to either the purported debtor or his or her family.

Congress concluded that such "collection abuses by independent debt collectors are serious and widespread and that existing State laws are inadequate to curb these abuses," and it declared that the purpose of the Act was "to eliminate abusive practices, not disadvantage ethical debt collectors . . . ." FDCPA § 802.

In passing the legislation, Congress rejected the contention of some that the primary beneficiary of debt collection legislation would be "deadbeats," finding only a very small percentage of people who willfully refuse to pay just debts. The Committee Report stated:

> One of the most frequent fallacies concerning debt collection legislation is the contention that the primary beneficiaries are 'deadbeats.' In fact, however, there is universal agreement among scholars, law enforcement officials, and even debt collectors that the number of persons who willfully refuse to pay just debts is minuscule.

> [This] is echoed in all major studies: the vast majority of consumers who obtain credit fully intend to repay their debts. When default occurs, it is nearly always due to an unforeseen event such as unemployment, overextension, serious illness, or marital difficulties or divorce.

Senate Committee on Banking, Housing and Urban Affairs, S. Rep. No. 95-382, 95th Cong., 1st Sess. 3 (1977).

In light of some of the conduct engaged in by apparently small segments of the collection industry toward relatively "innocent" consumers, it is easy to understand the continuing need for the FDCPA and the protections it provides to consumers.

The FDCPA provides that consumers may sue debt collectors in state or federal court for violations, in addition to providing for enforcement by a number of federal agencies, primarily the Commission. Nothing in the FDCPA, however, prohibits debt collectors from assisting creditors in the legal collection of debts due to them by consumers. Many members of the debt collection industry supported the passage of the Act and have voluntarily conformed their practices to its requirements since its enactment.

## B. Consumer Complaints

As I mentioned earlier, problems with debt collection are often featured in complaints received by the Commission. Consumer complaints greatly assist the Commission in its FDCPA enforcement program by helping our staff focus very limited resources on areas that appear the most in need of action. As the Commission reported to Congress in testimony last year in oversight hearings on the FDCPA held by the Subcommittee on Consumer Affairs and Coinage of the House Banking, Finance, and Urban Affairs Committee, consumer complaints to the Commission increased significantly in 1992 over prior years, although the volume is still far below what we received prior to enactment of the FDCPA.

To the extent that consumer complaints allege violations of the Act, they fall primarily into the categories of disclosure of the debt to unauthorized third parties, improper telephone collection techniques, misrepresentation of the consequences of nonpayment and failure to respond to consumer requests for verification of alleged debts. Of course, not all complaints to the Commission about collection problems reveal law violations. In some cases, for example, consumers may complain of lawful conduct that, nonetheless, may be annoying or upsetting. One complaint of this kind that comes in with some frequency is that debt collectors do not accept partial payments even though the original creditor might have accepted them. Others complain that debt collectors are rude on the telephone, and still others complain of acts by creditors who are collecting their own debts rather than using the services of a debt collector, and who, therefore, are exempt from the Act. While these alleged practices may frustrate and upset some consumers, they generally do not violate the Act.

Of course, not all consumers who have a quarrel with abusive tactics of debt collectors complain to the Commission. Some are unaware of the Act or of the Commission's role in enforcing it and complain only to state and local consumer protection agencies or to their creditors. Others do not complain at all, perhaps hoping that the annoying collection contacts eventually will cease. The Commission is continuing its efforts to expand public awareness of the Act and the Commission's enforcement program. As part of those efforts, the Commission's Consumer Education Office has published and distributed a brochure on fair debt collection. Over 361,300 copies of this brochure have been sent out since its first edition was published in 1979, and in March, 1994, alone, 15,000 of the latest edition were sent out. It is available both in English and Spanish.

## II. DEBT COLLECTOR RESPONSIBILITIES

Let me turn next to the responsibilities of debt collectors under the Act. They fall generally into five areas:

## A. Section 805(b) -- Communication with Third Parties

As you know, Section 805(b) of the Act bars debt collectors from communicating with most third parties about consumers' debts. Consumers continue to complain of unlawful communications by debt collectors with third parties who are not obligated to pay, such as the consumers' employers, co-workers, personnel or payroll offices, children, grandchildren, in-laws, parents, landlords, ex-spouses, roommates, girlfriends, boyfriends, aunts, uncles, brothers, sisters, secretaries, neighbors and friends. To the extent that debt collectors communicate to such third parties about consumers' alleged debts, their communications violate the Act. Sometimes, the collectors try to be clever, instructing their employees not to disclose the debt directly, but to "give every clue possible" to the third party about the

debt so there can be no doubt what is intended.

The potential for consumer injury is obvious in this context, because communications with consumers' employers and co-workers about purported debts can jeopardize the consumers' continued employment and prospects for promotion. These unlawful disclosures obviously embarrass consumers, and their relationships with family, friends, co-workers and neighbors may suffer from such contacts.

Consumers' complaints in this area indicate that some debt collectors use harassing collection techniques on third parties as if the third parties were the consumers purportedly owing the debt, or simultaneously call multiple third parties, such as neighbors or co-workers, simply for the purpose of intimidation. Unless the consumers consent, the FDCPA prohibits debt collectors from contacting any third party for any purpose other than obtaining information about the consumer's location, with few exceptions -- for example, a debt collector, without the consumer's consent, may communicate about the debt with the consumer's attorney, the creditor, the creditor's lawyer, the debt collector's lawyer and, under some circumstances, with a consumer reporting agency. Perhaps the most offensive practice in violation of this section that I have seen is communication to minor children of the debtor. I can assure you that collectors who use children in their attempts to collect debts can expect no sympathy from me.

## B. Section 806 -- Harassment or Abuse

Section 806 prohibits "conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Conduct expressly covered by this injunction includes, for example, the use of or threat of violence, the use of obscene or profane language and the making of repeated or continual telephone calls to harass the person being called. The Commission has received some complaints of abusive telephone collection techniques involving allegations that the collectors used profane, obscene, or other degrading or defamatory language to intimidate consumers, including racial and ethnic slurs and overt sexual comments to women. References to mental retardation and "brain problems" also have been made. Other complaints alleged that collectors reportedly have made repeated and continuous telephone calls, apparently for the sole purpose of harassing consumers in order to extract payment. In some instances, we have found evidence of debt collectors' calling a consumer once every five minutes for extended periods, or using an automatic redial for 15 minutes at a time.

## C. Section 805(a) -- Communications with the Consumer

Section 805(a) provides that without prior consent of the consumer, debt collectors may not communicate with a consumer about the collection of a debt at unusual times or places or at times or places that the collectors know or should know are inconvenient for the consumer -- in the absence of information to the contrary, the hours between 8:00 a.m. and 9:00 p.m. are assumed to be convenient. Presumably, this would take care of situations such as those in which the debtor has unusual working hours. Section 805(a) also generally bars communications about the debt with the consumer if the consumer has a lawyer and the debt collector knows this and knows or can readily ascertain the lawyer's name and address. It prohibits communications with the consumer about the debt at his or her place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such calls at work.

The Commission has received complaints from consumers alleging that debt collectors call them at the work place even after the debt collectors have been advised that such calls are not permitted by their employers. Consumers can lose their jobs because of these calls. Yet we have found information suggesting that some collectors simply destroy written instructions from the consumer not to make the calls. We also have received reports from consumers that they have been called by debt collectors before 8:00 a.m. or after 9:00 p.m., or at other inappropriate times or places. For example, one collector called a hospital's intensive care unit to talk to a consumer who was a relative of a gravely ill patient. Another called a child of a deceased parent at the funeral home. And still another collector insisted on calling a consumer who was under medical care in the hospital. Instances of this sort make clear the continued need for the Act, even if its effect is felt largely by a relatively small percentage of the debt collection industry.

## D. Section 807 -- False or Misleading Representations

Section 807 prohibits debt collectors from using false, deceptive or misleading representations or means in connection with the collection of a debt. We have received complaints involving misrepresentations by debt collectors of the likely results if a consumer does not pay a debt. These misrepresentations include false threats to institute civil or criminal court actions, garnish wages, attach property, cause job loss, or have the consumer arrested or jailed. Such representations violate the FDCPA if the threatened action is unlawful in the consumer's jurisdiction or if the collector lacks the legal authority to accomplish the promised result. For example, in states where garnishment requires a court order, a collector has no independent power to garnish a debtor's wages and therefore may not represent that it will do so.

The FDCPA also prohibits collectors from threatening action that they do not intend to take. Examples include threats by collectors to file suit, or to report adverse information to credit bureaus, when they do not intend to take such actions.

The Commission also continues to be concerned about complaints involving dunning letters that appear to have been sent by attorneys because they are sent on attorney letterheads but that are from non-attorney debt collectors or creditors. These letters not only often falsely threaten legal action, but also, may misrepresent the extent to which attorneys actually are involved in the collection process.

Finally, collectors often misrepresent their identities in order to get the consumer to talk to them. For example, a concerned parent

wants to talk to a teacher, who allegedly owes the debt. The so-called parent turns out to be the collector. Or a prospective employer or financial advisor of the consumer turns out to be another collector. Or the collector pretends to be having an affair with the consumer's husband. Or, perhaps most outrageous, the collector calls as a police officer or hospital representative concerning a family emergency. These examples show the depths to which some unscrupulous members of the industry will sink to further their aims in violation of the statute.

## E. Section 809 -- Validation of Debts

Section 809 requires, among other things, that debt collectors notify the consumer of the amount of the debt and the name of the creditor and that they include in the notice a statement that unless the consumer disputes the validity of the debt within 30

days of the notice, the debt will be assumed valid.(2) Consumers complain that debt collectors often fail to respond to letters from consumers disputing alleged debts and fail to obtain verification of disputed debts as the Act requires. Specifically, the Act gives a consumer the right to dispute a debt in writing and obligates the debt collector, on receipt of the dispute, to verify the debt with the creditor and send the verification to the consumer. This provision is designed to ensure that the debt collector has properly identified the consumer and has accurately determined the amount that the consumer owes, a central purpose of the FDCPA. I cannot over emphasize the importance of this requirement.

## F. Enforcement Actions

Ever since the FDCPA became effective in 1978, the Commission has pursued two parallel and complementary courses of action to bring about the maximum possible compliance with the law. Because it is preferable that debt collectors voluntarily comply with the statute, the Commission continuously has made extensive efforts to educate consumers and industry alike on the FDCPA's requirements. Despite the Commission's efforts to encourage voluntary compliance, some collectors choose not to comply voluntarily. The Commission, therefore, has also maintained a policy of vigorous enforcement of the FDCPA, particularly when the agency has encountered a pattern of serious violations.

The Commission's formal investigations may be prompted by consumer complaints, reports of collector misconduct by state and local agencies or information from other industry members. When an investigation produces evidence that indicates likely violations of the FDCPA by a debt collector, the staff of the Commission informs the violator of the results of its inquiry and attempts to settle its allegations before recommending to the Commission that a complaint be issued.

If a matter is settled and approved by the Commission, a consent judgment is drafted and forwarded to the Department of Justice, which files the judgment and a formal complaint in the appropriate federal district court. (Consent judgments are for settlement purposes only and do not constitute an admission by the debt collectors that they violated the law.) If settlement efforts fail, the Commission requests that the Department of Justice file suit in federal court on behalf of the United States, usually seeking a civil penalty and injunctive relief prohibiting the collector from continuing to violate the Act.

This past August, the Commission filed suit against Payco American, one of the country's largest debt collection agencies.(3) Payco was charged with illegally revealing consumer debts to third parties, using obscene or abusive language and falsely threatening arrest, garnishment of wages, or other legal action against consumers from whom they were attempting to collect debts for clients, in violation of the FDCPA.

The Commission asked the federal district court to issue an order prohibiting Payco from violating the FDCPA in the future and assessing a civil penalty of up to $10,000 for each violation of the law. In addition to asking the court to prohibit further violations of the FDCPA and to require the defendant to pay a civil penalty, the FTC has asked the court to require Payco to include, in each written collection communication to consumers in the future, a disclosure that the consumer has the right to have Payco stop communicating with them about their debt. The FTC also has asked the court to require Payco to provide each of its present and future employees a notice that the FDCPA says that, unless the consumer consents, a debt collector may not discuss the debt with any person other than the consumer and a few other persons, such as the consumer's attorney or spouse and that individual debt collectors may be financially liable for their violations of the Act. The case currently is pending decision.

The Commission's enforcement program has achieved a number of significant successes in recent years. The Commission won a significant preliminary victory in its case against a Maryland debt collection agency, National Financial Services, Inc., the owner of the agency, Robert J. Smith, and Frank Lanocha, an attorney who participated in the preparation and mailing of the company's debt collection letters.(4) The Commission's complaint alleged that the defendants had violated the FDCPA when they threatened to take legal action against consumers without intending to do so, implied in their dunning letters that their attorney was significantly involved in the collection process when his actual involvement was minimal and sent collection letters that essentially failed to give consumers notice of their right to dispute and to require to reverify the alleged debts. In an opinion on cross-motions for summary judgment dated January 8, 1993, the court appointed magistrate found for the government on all three violations charged. The government intends to seek an order enjoining future violations of the FDCPA and imposing a substantial civil penalty on the defendants.

The Commission obtained a $100,000 civil penalty settlement to resolve its charges that Credit Claims & Collections, an Atlanta-based debt collection company, violated the FDCPA by using obscene language, threatening to use violence, illegally contacting consumers at their jobs, causing the telephone to ring repeatedly at consumers' homes, contacting consumers when they know consumers are

represented by an attorney with respect to the debt, and falsely claiming affiliation with the government.(5) I might add here that falsely claiming affiliation with the government is another one of my pet peeves, right after repeating threats to minor children of the debtor. In addition to the civil penalty, the Credit Claims & Collections Company entered into a consent decree that includes broad prohibitions of future FDCPA violations and requires the collector to inform the consumers it contacts in writing that Federal law prohibits debt collectors from harassing them.

The Commission obtained a $130,000 civil penalty from D.C. Credit Services, a California-based debt collection company, and its former President, David Cohen, in settlement of its charges that they violated the FDCPA by using obscene language, threatening violence, calling consumers at their jobs when they knew employers prohibited such calls, ignoring written requests by consumers to cease communication with them, causing the telephone to ring repeatedly at consumers' homes, falsely representing that they were attorneys, misrepresenting the consequences of nonpayment and continuing to collect debts that consumers had disputed in writing before the defendants verified them.(6) In addition to the civil penalty, the defendants entered into a consent decree that permanently enjoined future violations of the FDCPA and required defendants to notify consumers in their first letter of their rights under the FDCPA and of the Commission's responsibility to enforce the law.

Most recently, the Commission settled another debt collection matter after extensive litigation against David Renner, formerly doing business in Florida as Collections, Unlimited.(7) The consent decree permanently enjoins the defendant from engaging in numerous violations of the FDCPA alleged in the complaint. At the time of settlement, the defendant's collection business had ceased operations, and the defendant had been convicted of violating Florida's criminal fraud statutes.

## G. Education and Informal Enforcement

As in other areas of the law, the Commission considers its program to educate both industry and consumers about the Act essential to the success of its enforcement program. The staff of the Commission maintains with industry members and other groups, a continuing dialogue that assists its informal enforcement activities designed to promote voluntary compliance with the FDCPA. This approach allows the Commission staff to focus its scarce resources on litigation to halt serious, persistent violations of the Act.

In 1988, the staff of the Commission issued a Staff Commentary on the FDCPA,(8) collecting the staff's informal written opinions on various aspects of compliance with the Act. This is an important document for you to know about. It epitomizes the Commission's program of industry and consumer education. Although it does not constitute a binding regulation or even a guideline that is binding on the Commission, the Staff Commentary continues to be well received by attorneys, industry representatives and consumers because it provides guidance to all parties on the staff's views concerning the application of the FDCPA to various debt collection practices and suggests likely Commission positions on such matters.

In appropriate cases, the Commission staff contacts the debt collectors and asks them to comply with the FDCPA. When made aware of potential law violations, many debt collectors voluntarily correct their conduct. This type of cooperation is particularly desirable when violations appear to be either technical or otherwise relatively minor. If violations can be corrected informally, resort to more formal and time-consuming enforcement actions often becomes unnecessary.

The Commission also advises consumers who call or write the Commission about debt collection problems, informing them of their rights and of any self-help remedies available to them and outlining the principal benefits the Act provides to consumers. For example, a consumer may be informed, where applicable, of his or her right to (1) write to the debt collector to request verification of the debt, which the collector must provide before resuming collection activity, (2) demand in writing that the collector cease all further communication or (3) sue a collector that appears to be violating the Act, in order to recover actual damages and certain additional damages (plus court costs and attorneys' fees) if their litigation is successful. This advice makes consumers aware of the specific steps they may take under the FDCPA to help themselves when dealing with abusive debt collectors. Where the staff believes that no violation is apparent, consumers are so informed.

State and local officials who administer state laws governing debt collectors as well as state and local consumer protection organizations are also valuable resources for the Commission. The Commission's staff regularly exchanges information with these organizations and, where appropriate, forwards complaints to local officials for remedial action, or receives complaints from such officials for use in focusing the Commission's investigations.

Finally, the staff of the Commission often participates in conferences and workshops sponsored by industry members, facilitating communication with debt collectors in a context that affords an opportunity to (1) discuss the Commission's views and goals, (2) distribute materials that explain the staff's interpretations of the FDCPA, and (3) listen to the concerns of debt collectors. Additionally, the staff maintains an informal communication network with trade associations like this one and with individual collection firms that is designed to enhance exchanges of information.

## III. ATTORNEY RESPONSIBILITIES

## A. Recent Enforcement Actions

I already have mentioned the case against National Financial Services, Inc. In separate but related actions against Phonequest, Inc., and Seattle attorney Arnold Joseph Barer,(9) the FTC announced that Barer -- whose signature appeared on the letters that were

written on his letterhead -- has agreed to pay a $5,000 civil penalty to settle identical FTC charges that he violated the FDCPA. According to the FTC complaint detailing the allegations against the corporate defendants, these companies provided telephone information services that consumers accessed by calling specific 900 or 976 numbers.

The FTC alleged in its complaints that, on numerous occasions from April 1988 to June 1990, the defendants sent copies of a collection letter, drafted by Barer and approved by another defendant, to thousands of consumers who had disputed specific charges on their telephone bills for the defendants' services. The FTC alleged that the letter was printed on letterhead that said "Law Offices of Arnold J. Barer" and included a facsimile of Barer's signature even though, the FTC charged, he was not involved in the collection of the alleged debts to the extent the letters represented, nor did he sue any of the consumers to whom the letter was sent as represented in the letters. According to the complaints, the defendants represented to consumers that the letter was from an attorney, threatened to take legal action they did not intend to take, and otherwise used false representations to collect debts -- all violations of the FDCPA. The FTC also charged all the defendants, including Barer, with failing to notify consumers -- in the initial debt-collection letter, or within five days of the letter, as required by the FDCPA -- of their right to dispute debts or to seek to have them validated.

## B. Statutory Requirements

As originally enacted, the FDCPA exempted "any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client . . . ." In July 1986, Congress removed that total exemption of attorneys, because of its concern that it was unfair to allow attorneys to engage in the same abusive practices that were proscribed by the FDCPA for non-attorney debt collectors. Because traditional debt collectors had been made subject to the FDCPA's restrictions when they sent consumers dunning letters and made phone calls to consumers to collect debts on behalf of others, Congress apparently believed that attorneys performing the same functions should be similarly limited.

## C. Court Decisions

A recent federal appellate decision held that an attorney whose collection practice is limited to the filing of lawsuits is covered by the FDCPA. Scott v. Jones, 964 F.2d 314 (4th Cir. 1992). Notwithstanding the apparent lack of any traditional debt collection activity, such as dunning letters and phone calls, the court viewed the attorney's filing of collection lawsuits to be literally covered under the definition of "debt collector" set forth in Section 803(6), because the attorney was operating a "business the principal purpose of which is the collection of any debts . . . owed or due another." In its view, the language of the statute was "clear and unambiguous" and "the legislative history sufficiently sparse, that the legislative history has relatively little persuasive weight in comparison to the plain meaning of the statute."

Several federal courts have taken the opposite view. Most recently, in Green v. Hocking, 792 F. Supp. 1064 (E.D. Mich. 1992), the court granted summary judgment in favor of an attorney charged in a private action under the FDCPA, stating that holding an attorney who only files lawsuits liable under the FDCPA "would produce a result demonstrably at odds with Congress' intent in enacting the 1986 amendment, and thus the statute's seemingly strict language is not controlling."

Other decisions have cited the FTC Staff Commentary on the FDCPA, as well as the legislative history, in finding that attorneys are not debt collectors unless they engage in traditional collection actions. For example, in Fireman's Ins. Co. v. Keating, 753 F. Supp. 1137, 1142-43 (S.D.N.Y. 1990), the court held that because a law firm initiating a legal proceeding to recover a debt cannot be deemed a "debt collector" as defined by the FDCPA, the venue provisions of the FDCPA are inapplicable. And in National Union Fire Ins. Co. v. Hartel, 741 F. Supp. 1139, 1141 (S.D.N.Y. 1990), the court found that a law firm representing a plaintiff guarantor of notes executed by defendant investor in limited partnership is not a "debt collector" within the meaning of the FDCPA because it has engaged in activities only of a purely legal nature in seeking reimbursement for the plaintiff.

Coverage of attorneys who litigate lawsuits to recover consumer debts could produce anomalous results. For example, an attorney who conducted a third party pretrial deposition would violate Section 805(b)'s prohibition on disclosing the debt to third parties. The filing of a complaint alone would trigger disclosure requirements that lack a persuasive rationale in this context. The attorney would have to include the notice required by Section 807(11) -- stating that the attorney was attempting to collect a debt and that information would be used for that purpose -- when he or she served the consumer, and would have to include (or follow up with) the "validation" notice required by Section 809.

If the consumer responded to the Section 809 notice by disputing the debt, the attorney may arguably be required by the Act to drop (or at least stay) the lawsuit, because the provision requires a debt collector to "cease collection of the debt" until he or she verifies it with the creditor. Therefore, it may not be practical to apply the FDCPA to the activities of litigation attorneys.

# IV. CREDITOR RESPONSIBILITIES

## A. Statutory Exclusion

The definition of debt collector under the FDCPA excludes creditors collecting their own debts.

## B. Potential Liability

Recently, the Commission issued an administrative complaint alleging that American Family Publishers, one of the largest sellers of magazine subscriptions in the nation, knew about and approved deceptive debt collection letters sent by its collectors, thereby assisting conduct that was unlawful under the FDCPA.(10) Under the terms of a Commission-approved settlement agreement, American Family Publishers is required to instruct its collectors to comply with the FDCPA in the future and is prohibited from misrepresenting either that an attorney is actively and substantially involved in the collection of any debt, or that legal action with respect to any alleged debt is about to be or will be initiated.

In connection with any sale of its accounts to debt collectors, American Family Publishers agreed not to encourage misrepresentations by the debt collector of the degree of attorney involvement or the likelihood of legal action resulting from a debtor's failure to pay a debt. In addition, American Family Publishers also must determine whether the debt collector is making misrepresentations, and refuse to sell accounts to debt collectors that it knows are making them. Finally, it must notify the Commission when it terminates any sale of accounts to a debt collector for that reason.

## V. LEGISLATIVE ISSUES -- AMENDMENTS PROPOSED BY THE COMMISSION

Section 815 of the FDCPA directs the Commission to submit annual reports to Congress "concerning the administration of its functions under this title" and authorizes it to include "such recommendations as the Commission deems necessary or appropriate." The Commission has recommended two amendments to the FDCPA in accord with this mandate.

### A. Section 807(11)

The first of these recommendations would amend Section 807(11) of the Act, which specifically requires a debt collector to "disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." The Commission has recommended that Congress amend this provision to clarify its meaning in light of two conflicting appellate court decisions.

A 1985 decision by the Ninth Circuit in Pressley v. Capital Credit & Collection Service, 760 F.2d 922 (9th Cir. 1985), held that the Section 807(11) disclosure need only be given in the first communication. The Ninth Circuit took the view that requiring the disclosure in every communication with a debtor ignores congressional intent, and that it serves no useful purpose to require repetition of a formal warning when the debt collection purpose of the communication is clear to the recipient. In 1988, the Commission Staff Commentary on the FDCPA adopted the Pressley court's reasoning in its discussion of Section 807(11) of the FDCPA.

In a 1989 decision, however, the Second Circuit in Pipiles v. Credit Bureau of Lockport, 886 F.2d 22 (2d Cir. 1989), explicitly rejected Pressley and took a literal approach. According to that opinion, the language of the statute unambiguously requires that the Section 807 (11) notice be given in all communications made to collect a debt, "even if there were little discernible purpose in repetition" of the notice in follow-up communications, and it is improper for courts to substitute an alternative view.

These two decisions demonstrate that the two courts of appeal are now irreconcilably split in their interpretations of Section 807(11). The Commission, therefore, has recommended that Congress reexamine that provision and clarify its intent.

### B. Section 809

Second, the Commission has recommended that Congress amend Section 809 to make explicit the standard for clarity to be applied to the notice required by Section 809 of the Act. Section 809(a) requires debt collectors to send a written notice to each consumer within five days after the consumer is first contacted, stating that if the consumer disputes the debt in writing within thirty days after receipt of the notice, the collector will obtain and mail verification of the debt to the consumer. Section 809(b) provides that if the consumer, within the thirty day period, disputes the debt in writing, the collector must cease all collection efforts until verification of the debt has been obtained and mailed to the consumer.

Some debt collectors print the notice required by Section 809(a) in a type size considerably smaller than the other language in the dunning letter, or obscure the notice by printing it on a non-contrasting background in a non-contrasting color. For example, the use of light ink and tiny print on a white background was found to be a violation of Section 809 in the magistrate's opinion upholding the Commission's complaint allegations in the National Financial Services case.

Significantly, two courts of appeal have held that collection letters that use small or otherwise obscured print in the notice required by Section 809(a) and at the same time use much larger, prominent or bold faced type in the text of the letter, violate the Act. Miller v. Payco-General American Credits, Inc., 943 F.2d 482 (4th Cir. 1991); Swanson v. Southern Oregon Credit Services, Inc., 869 F.2d 1222 (9th Cir. 1989). The courts reasoned that the payment demand in the text both contradicts and overshadows the required notice. Neither of the courts attempted to specify what elements of presentation (e.g., the color and size of type, location in the document) would constitute a clear disclosure to consumers of their dispute rights under Section 809(a) of the Act.

The Commission has recommended that Congress obviate this problem by amending Section 809 explicitly to require a more conspicuous notice. As presently drafted, Section 809(a) does not specify that the notice be in any given format, that it use a particular design or type-size or that it appear in any stated location in dunning letters. The Commission has recommended that Congress amend the provision to require, for example, that the notice be made in a manner that is "clear and conspicuous," a standard that the

Commission has used for disclosures of material information in other contexts. A number of court decisions have defined the "clear and conspicuous" standard in a variety of contexts, and proper application of such a standard in Section 809(a) would help ensure that the information in the required notice is effectively conveyed. It also would reduce the incidence of dunning letters that are artfully designed to confuse their readers and frustrate the purposes of this provision of the Act.

## VI. CONCLUSION

This concludes my prepared remarks. I would be happy now to answer your questions.

## Endnotes:

1. V. Hugo: Les Miserables V.ii.

2. The Section also provides that the debt collector must tell the consumer that if he or she notifies the debt collector in writing within the 30-day period that the debt is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and mail it to the consumer. The debt collector also must tell the consumer that the name and address of the original creditor will be provided if it is different from that of the current creditor. If the consumer notifies the debt collector in a manner consistent with the Act, the debt collector must cease collection of the debt or any disputed portion until obtaining verification and notifying the consumer. A consumer's failure to dispute the validity of a debt under § 809 "may be construed by any court as an admission of liability by the consumer."

3. United States v. Payco American Corp., Civ. No. 93-C-0801 (E.D. Wis. filed Aug. 2, 1993).

4. United States v. National Financial Services, Inc., Civ. No. L-91-226 (D. Md. Jan. 8, 1993) (decision on summary judgment holding defendants liable; decision on injunction and civil penalties pending).

5. United States v. Nationwide Credit, Inc., d/b/a Credit Claims & Collections, Inc., Civ. No. 1-92-CV-1219-MHS (N.D. Ga. May 22, 1992).

6. United States v. D.C. Credit Services, Inc., Civ. No. 92-3778-AWT (C.D. Cal. filed June 26, 1992); United States v. David Cohen, Civ. No. 92-3777-ER (C.D. Cal. filed June 26, 1992)

7. United States v. David Renner, Civ. No. 89-1503-Civ-T-10A (M.D. Fla. March 14, 1994).

8. 53 Fed. Reg. 50097-50110 (December 13, 1988).

9. United States v. Arnold J. Barer, Civ. No. C-93-567 (W.D. Wash. May 12, 1993); United States v. HDL, Inc., Civ. No. C-93-566 (W.D. Wash. April 27, 1993).

10. American Family Publishers, Inc., FTC Docket No. 9240, January 21, 1993.

Last Modified: Monday, 25-Jun-2007 00:00:00 EDT

# 08-21843-CIV-MORENO/TORRES

≈JS 44 (Rev. 2/08)

## CIVIL COVER SHEET

FILED by __TS__ D.C.
ELECTRONIC

**June 26, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as req
by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of C
the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases

### I. (a) PLAINTIFFS

VERONICA KELLY, a citizen of Pennsylvania, individually and on behalf of all others similarly situated,

### DEFENDANTS

PALMER, REIFLER & ASSOCIATES, P.A., a Florida partnership

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Lance A. Harke, P.A.        Miami, FL 33130
Harke & Clasby LLP
155 South Miami Ave., Suite 600     Tel: 305-536-8220
                                    Fax: 305-536-8229

Attorneys (If Known)

**(d)** Check County Where Action Arose: ✓ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
✓ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ✓ 4 |
| Citizen of Another State | ✓ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

*Dade Co. 08CV21843 Moreno/Torres*

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

### V. ORIGIN (Place an "X" in One Box Only)

✓ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ✓ NO      b) Related Cases ☐ YES ✓ NO

JUDGE _____       DOCKET NUMBER _____

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Plaintiff files this complaint for violations of the Federal RICO 18 U.S.C. §1961 laws and Florida Deceptive and Unfair Trade Practice Act.

LENGTH OF TRIAL via _10_ days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:

✓ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ✓ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 6/26/08

FOR OFFICE USE ONLY

AMOUNT $350.00   RECEIPT # 982847 IFP

06/26/08