## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-21843-CIV-MORENO/TORRES

VERONICA KELLY, a citizen of Pennsylvania,
LIL SIMON, a citizen of Florida, and
RON BAUM, a citizen of Florida, individually
and on behalf of all others similarly situated,

      Plaintiffs,

vs.

PALMER, REIFLER & ASSOCIATES, P.A.,
a Florida partnership,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON
## MOTIONS FOR SUMMARY JUDGMENT

      This matter is before the Court on Defendant Palmer, Reifler & Associates, P.A.'s ("Palmer Law Firm" or "the firm") Motion for Summary Judgment [D.E. 165] and Plaintiffs Veronica Kelly, Lil Simon, and Ron Baum's (collectively, "Plaintiffs") Motion for Partial Summary Judgment on Liability for Violations of FDUTPA [D.E. 119]. The Honorable Federico A. Moreno referred this case to the undersigned Magistrate Judge for all pretrial proceedings [D.E. 62]. After considering the motions and related filings, and the entire record in this case, the Court recommends that Defendant's motion for summary judgment be Granted, and Plaintiffs' motion be Denied, for the reasons set forth below.

## I.   BACKGROUND

This lawsuit concerns demand letters sent by the Palmer Law Firm pursuant

to various states' civil theft recovery statutes.  These statutes, which have been enacted

in all fifty states, allow retail stores and other commercial entities to recoup losses

sustained as a result of retail theft.  The Palmer Law Firm has been retained by

numerous retailers and commercial entities to pursue civil damages and penalties

against individuals detained in the clients' stores for shoplifting, pursuant to these civil

theft recovery statutes.

Plaintiffs Veronica Kelly, Lil Simon, and Ron Baum or their children received

civil theft demand letters from the Palmer Law Firm.  Plaintiff Kelly, who resides in

Pennsylvania, received three letters from the firm in connection with an incident at

J.C. Penney involving her minor child.  [D.E. 119-5[1] at 2 ¶ 3].  The first letter Kelly

received stated:

Dear Parent/Guardian of []:

This Law Firm represents JCPENNEY concerning its claim
against you in connection with an incident involving your child in their
store 67 on 3/1/2008.

---

[1]     Docket Entry 119 is Plaintiffs' Motion for Partial Summary Judgment on
Liability for Violations of FDUTPA.  The majority of the documents filed in support of
the motion were designated "confidential" by the Palmer Law Firm and were referred
to in the pleadings but not filed.  This procedure was followed in accordance with our
Order denying without prejudice Plaintiffs' motion to file its summary judgment
motion and exhibits under seal.  [D.E. 116].  A courtesy copy of the motion was,
however, provided to the Court.  Having reviewed the materials, we do not find good
cause for them to be sealed.  Accordingly, we order Plaintiffs to immediately file with
the Clerk of Court those materials previously withheld when D.E. 119 was filed.  As
an aside, we note that Judge Moreno recently denied the Palmer Law Firm's motion
to file under seal the depositions of the firm's corporate representatives.  [D.E. 212].

> Pursuant to "Damages in actions on retail theft" statute, 42 Pa.C.S.A. § 8308, JCPENNEY may proceed with a civil penalty action against you.
>
> **You may settle this matter by making payment to us in the amount of $202.00 within twenty (20) days of the date of this letter.** Upon receipt of full payment and clearance of funds, you will receive a written release of the civil penalty claim.
>
> Payment should be made payable and mailed to [the Palmer Law Firm.] . . . .
>
> Should payment fail to be made, we will review the file for the possibility of further civil action and may choose to request pre-litigation attorney's fees. Therefore, to avoid a higher demand request, please make payment in full according to the terms stated or call our office to set up suitable payment arrangements.

[*Id.* at 4 (emphasis in original)]. The letter was signed by a lawyer admitted to practice

law in Pennsylvania as "Of Counsel for the Firm."

The second letter to Ms. Kelly noted her failure to pay pursuant to the prior

written demand, and advised in pertinent part:

> Pursuant to the "Damages in actions on retail theft" statute, 42 Pa.C.S.A. § 8308, JCPENNEY may now proceed with litigation against you.
>
> **You may stop a lawsuit from being filed and settle this matter by making payment to us in the amount of $477.00 within ten (10) days of the date of this letter.** . . . .
>
> * * *
>
> Should payment fail to be made, our client may then proceed to file a lawsuit against you, in which case our client may seek attorney's fees, court costs and other legal expenses throughout the litigation. In such case, you would be served by the Sheriff or other means with a summons requiring you or your attorney to appear in court to defend the action. If successful in any such litigation, we estimate that our client would be seeking a final judgment of damages, attorney's fees and court costs in excess of the amount demanded herein.

Please make payment according to the terms herein to avoid such action.

[*Id.* at 5 (emphasis in original)].  The third letter Kelly received was similar to the second letter, again noting her failure to pay and demanding $477.00.  [*Id.* at 6].  Kelly has refused to pay because her daughter assured her that she did not steal anything from the retailer.  [*Id.* at 3 ¶ 5].

Plaintiff Simon received three letters in connection with an incident at Wal-Mart involving her adult child, Michael, who resides with her in Florida.  [D.E. 119-6 at 2 ¶¶ 3, 5; D.E. 165-3 at 5-6].  The first two letters, sent by Wal-Mart, demanded payment of $200.00.  [D.E. 119-6 at 2 ¶ 4].  The third letter was sent by the Palmer Law Firm and signed by James R. Palmer of the firm.  [*Id.* at 4].  It was similar to the second letter the firm sent to Kelly and demanded payment of $275.00 to "stop a lawsuit from being filed and settle this matter."  [*Id.*].  Simon paid $280 to the Palmer Law Firm and received a written release.  [*Id.* at 3 ¶ 6; D.E. 165-3 at 24, 30].

Plaintiff Baum received one letter from the Palmer Law Firm in connection with an incident at Macy's involving his minor child.  [D.E. 165-5 at 11, 22].  He paid the $200 demand amount and received a written release. [D.E. 192 ¶ 123; D.E. 165-5 at 23-25, 27].

The Palmer Law Firm has approximately 90 employees, six of whom are lawyers.  [D.E. 119–2 at 24-26].  The firm associates with attorneys in other states (the "of counsel" attorneys) who, the firm asserts, render advice on the substantive law of his or her state, respond to opposing parties' phone calls and correspondence, sometimes review case information, execute certified demand letters, and file suit

when authorized by the client. [D.E. 166-12 at 3 ¶ 8]. According to Natt O. Reifler, a partner at the Palmer Law Firm with overall supervision of the firm's legal department and collections, the firm sent out over four million demand letters between June 2004 and March or April 2009, averaging approximately 70,000 per week. [D.E. 213-1 at 48-49, 69-70]. The majority of people pay after receiving a demand letter, but some do not, and the total figure includes second and third letters as well as the initial demand letter. [*Id.*].

The firm's demand letters are based on information provided to the firm by their retail clients, often but not always in an electronic format. [*Id.* at 72, 78; D.E. 119-12 ¶¶ 4, 6]. For some of its clients, the firm conducts an individual review of the information provided by the client. [*Id.*]. For many other clients, the firm relies, at least initially, on the internal review and loss prevention procedures set up by the individual retailers and discussed with the firm. [*Id.*]. For some but not all of its clients, the firm manually calculates the demand amount that is set forth in the letters. [*Id.*]. For many clients, there is no separate review by an attorney prior to the firm sending out a demand letter that is signed by an attorney. [Reifler Depo. at 78-79, 8; D.E. 119-12 ¶ 6]. Reifler estimated that close to one million written releases have been sent out by the firm, meaning close to twenty-five percent of the people who received demand letters paid in response thereto. [Reifler Depo. at 94-95]. The firm offers many of its retail clients the option of litigation services, often by separate agreement. [D.E. 119-9 at 4 ¶ 2.3.e; D.E. 119-10 at 2, § 5; Reifler Depo. at 81-82]. Between June 2000 and June 2008 (the month the present lawsuit was filed), fifteen

civil recovery lawsuits had been filed by the Palmer Law Firm after a demand letter had been sent.  [D.E. 119-13 at 8-9].  By October 2008, seventy-seven cases had been filed.  [*Id.*].

Plaintiffs have sued to stop the Palmer Law Firm's practice of sending demand letters that are allegedly deceptive, unfair, and oppressive and whose purpose is "to harass, intimidate and coerce consumers into paying a large fine by threatening civil action (which they have no intention of filing) by a local attorney (that has no involvement in the case) and a visit from the 'sheriff' (which they know won't happen))."  [D.E. 11 at 2 ¶ 3].  According to Plaintiffs, the Palmer Law Firm collects information from its retail clients and, utilizing sophisticated computer software, automatically generates misleading demand letters, calculates demand amounts, and affixes a local attorney's signature to the demand letter, all without attorney review. [*Id.* at ¶ 4].

Plaintiffs have asserted the following claims against the Palmer Law Firm: damages for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c) (Count I); declaratory and injunctive relief under 18 U.S.C. § 1964(a) (Count II); money had and received (Count III); unjust enrichment (Count IV); and violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* (Count V).

Plaintiffs seek certification of two subclasses.[2]  Plaintiff Kelly seeks to represent the "Injunctive Class," which is defined as:

_____

[2]      Plaintiffs' motion for class certification [D.E. 124] will be the subject of a separate Report and Recommendation, if necessary.

> All individuals in the United States, who after June 26, 2004, received a letter from the Palmer Law Firm demanding civil damages pursuant to a state civil recovery statute.  The class excludes all persons that were [] either sued by the Palmer Law Firm or convicted of retail theft.

[D.E. 11 at 11 ¶ 41].

Plaintiffs Simon and Baum seek to represent the "Monetary Class," which is defined as:

> All individuals in the United States, who after June 26, 2004, received a letter from the Palmer Law Firm demanding civil damages pursuant to a state civil recovery statute and made a payment.  The class excludes all persons that were either sued by the Palmer law Firm or convicted of retail theft.

[*Id.*].

The Palmer Law Firm moves for summary judgment in its favor on all of Plaintiffs' claims, as discussed below.  Plaintiffs move for partial summary judgment on liability for violations of FDUTPA.[3]

## II.   ANALYSIS

### A.   *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Imaging Bus. Mach., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the Court must view all the evidence and make all reasonable inferences in the light most favorable to the nonmoving party.  *Id.* (citing

---

[3]   No party requested a hearing on these motions.

*Cruz v. Public Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)).  A material fact is one that might affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999).  Thus, the task is to determine whether, considering the evidence in the light most favorable to the plaintiff, there is evidence on which the trier of fact could reasonably find a verdict in their favor.  *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225.

## B. *Preliminary Standing Issues*

### 1. *Plaintiff Veronica Kelly*

The Palmer Law Firm argues that Plaintiffs Veronica Kelly and Lil Simon lack standing to bring this action.  With regard to Kelly (who seeks only injunctive relief in this case), the Palmer Law Firm argues that her claims under RICO and FDUTPA are moot.  The argument is based on the fact that the Palmer Law Firm has ceased sending civil demand letters to her and has stipulated that it will not take further action against her or her daughter regarding the underlying alleged theft incident.[4]

Plaintiffs acknowledge that the Palmer Law Firm stopped sending civil demand letters to Kelly, but only voluntarily, in response to this litigation.  They assert there is no legal restriction that prevents the firm from sending letters to Kelly in the future.  Moreover, Plaintiffs point out that the Palmer Law Firm has not stopped sending

---

[4]    Natt Reifler submitted a sworn declaration to this effect on behalf of the Palmer Law Firm.  [D.E. 105-3 at 6, ¶ 8(c)].

demand letters and placing automated calls to thousands of other people each week. Thus, Plaintiffs say, the firm is continuing its offensive conduct, the controversy is on-going, and Kelly's claims are not moot.

The doctrine of voluntary cessation provides an exception to the general rule that a case is mooted by the end of the offending behavior. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1183 (11th Cir. 2007) (internal citation omitted). A federal court is not deprived of jurisdiction over a controversy simply because the defendant voluntarily ceased the offending behavior. *Id.* If that were the case, the defendant would later be free to return to his old ways. *Id.* "A defendant's assertion that it has no intention of reinstating the challenged practice 'does not suffice to make a case moot' and is but 'one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts.'" *Id.* at 1184 (internal citation omitted) (other factors include (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether cessation of the offending behavior was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether the defendant acknowledged liability when it ceased the conduct).

Voluntary cessation of allegedly offensive conduct moots a claim only "if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Nat'l Advertising Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) ("mere voluntary termination of an allegedly illegal activity is not always sufficient to render a case moot and deprive the federal courts of jurisdiction to try the

case."). It must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (internal citations omitted). The burden of showing that the challenged behavior cannot reasonably be expected to begin again is a formidable one, and lies with the party asserting mootness. *Sheely*, 505 F.3d at 1184.

The Palmer Law Firm has not met its burden. We see nothing in the record that bars the firm from sending Kelly demand letters again. The sworn declaration from one of the firm's partners that it will not do so is insufficient in this regard. Morever, the Palmer Law Firm continues to send demand letters to other individuals. This is precisely the practice that Kelly seeks to prevent through her suit for injunctive relief. Her claims are not moot.

The Palmer Law Firm also argues that Kelly cannot sustain her FDUTPA claim because, not having paid anything to the firm, she did not suffer actual damages. The firm incorrectly recites the standard she must satisfy: (1) a deceptive act or practice; (2) causation; and (3) actual damages. [D.E. 165 at 7-8 (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2007)]]. But this standard applies to a plaintiff attempting to recover *damages* for unfair or deceptive practices under Fla. Stat. § 501.211(2).

However, Kelly is seeking only *injunctive* relief. Fla. Stat. § 501.211(1) permits a claim for injunctive relief by "anyone aggrieved" by an unfair or deceptive act. We find, and the firm does not seriously dispute, that Plaintiff Kelly was "aggrieved" by receipt of allegedly misleading demand letters from the Palmer Law Firm. Therefore, the argument that she cannot satisfy the injury requirement of FDUTPA is unavailing.

*See, e.g., Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S. D. Fla. 1990) (professional writer who allegedly lost ability to publish and who was seeking injunctive relief under § 510.211(1) rather than damages under § 501.211(2) could proceed with claim by alleging that defendant engaged in deceptive act or practice and that he was "aggrieved" by that act or practice; "anyone aggrieved" includes a broader class of complainants than merely consumers; scope of injunctive remedy is greater than the actual damage remedy); *Galstaldi*, 2009 WL 1393425, at *9 (§ 501.211(1) is "broadly worded to authorize declaratory and injunctive relief even if those remedies might not benefit the individual consumers who filed the suit.") (internal citation omitted)); *Big Tasty v. Tasty Concepts, Inc.*, 972 F. Supp. 662, 664 (S.D. Fla. 1997) ("anyone aggrieved" includes competitors who seek an injunction against continued trademark infringement under § 501.211(1)).

### 2.   *Plaintiff Lil Simon*

The Palmer Law Firm challenges Plaintiff Lil Simon's standing to sue because the civil demand letter was not sent to her but to her adult child, Michael Simon, over whom she does not have legal guardianship.  The firm argues that it is Michael's substantive rights, not Lil's, that would have been violated if Plaintiffs' allegations are true.  Moreover, the firm points out that the payment was made by Lil's husband, though admittedly by credit card from their joint account.  The firm thus asserts that Lil was not injured, is not the real party in interest here, and lacks standing to sue on behalf of her son.

Plaintiffs counter that Lil is not suing to assert her son's rights but her own. They note that the demand letter was received "at her home and [Lil] made the payment to Palmer with her own money on behalf of her son who lives at home and is on disability due to various mental and physical disabilities." [D.E. 191 at 4]. They contend that Lil suffered a direct monetary damage as a result of the Palmer Law Firm's conduct and thus is an "aggrieved" person under the FDUTPA statute, specifically § 501.211(1). [*Id.*]. Moreover, they claim it is the firm's "admitted practice . . . to specifically target parents for payment" of the demand amounts. [*Id.*].

We find that Lil does have standing. She testified that she received a letter demanding money from the Palmer Law Firm, read it with her son Michael, and was worried that if she didn't pay the debt demanded therein, legal consequences might ensue, including the filing of a lawsuit against them and an assessment of attorney's fees. [D.E. 165-3 at 17-19]. Consequently, she paid the demand amount. [*Id.* at 24]. That the letter was addressed to her son because of his actions and the payment was physically made by her husband is of no moment. Lil read the letter, felt intimidated, and approved payment from a joint account. [*Id.* at 30]. She has suffered a monetary loss as a result of receipt of the demand letter from the Palmer Law Firm. Assuming a cause of action lies, she may bring a claim for actual damages under § 501.211(2). She may also sue for injunctive relief under § 501.211(1) as she is an "aggrieved" person under the FDUTPA. *See* Fla. Stat. § 501.202 (providing for a liberal construction of the provisions of FDUTPA in order to protect the consuming public from those who engage in unfair methods of competition, unconscionable, deceptive, or

unfair acts or practices in the conduct of any trade or commerce); *see also, Galstaldi v. Sunvest Cmtys. USA, LLC*, No. 08-62076-CIV, 2009 WL 1393425, at *9 (S.D. Fla. March 25, 2009) (§ 501.211(1) "is broadly worded to authorize declaratory and injunction relief even if those remedies might not benefit the individual consumers who filed the suit. The FDUTPA is 'designed to protect not only the rights of litigants, bu also the rights of the consuming public at large.'" (internal citations omitted)).

### C.   *Florida's Litigation Privilege*

The Palmer Law Firm contends that Plaintiffs' claims are barred in blanket fashion by the litigation privilege. In Florida, the litigation privilege "essentially provid[es] legal immunity for actions that occur in judicial proceedings." *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 383 (Fla. 2007) (holding that the litigation privilege was not reserved for common law tort actions but applied "across the board . . . to common-law causes of action, those initiated pursuant to a statute, or of some other origin."). The Florida Supreme Court explained the purpose of this privilege:

> Just as participants in litigation must be free to engage in unhindered communication, so too must those participants be free to use their best judgment in prosecuting or defending a lawsuit without fear of having to defend their actions in a subsequent civil action for misconduct.

*Id.* at 384 (quoting *Levin, Middlebrooks, Mabie, Thomas, Mayes Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994)). "Absolute immunity must be afforded to any act occurring during the course of a judicial proceeding . . . so long as the act has some relation to the proceeding." *Id.*

In our case, the question is whether the litigation privilege can be invoked for communications made prior to initiation of a judicial proceeding.  The court in *Echevarria* expressly declined to determine at what point the litigation privilege could first be asserted, *id.* at 383 n.1, but the Fourth District Court of Appeal addressed the issue head-on in *Pledger v. Burnup & Sims, Inc.*, 432 So. 2d 1323 (Fla. 4th DCA 1983). The question in *Pledger* was whether the privilege attached to allegedly defamatory statements made before a judicial proceeding had been initiated.  *Id.* at 1325.  The statements at issue in that case were contained in a writing labeled "complaint" that was sent to the plaintiff's attorney.  *Id.*  The "complaint" was never filed in court but apparently part of it formed the basis for another document that eventually was filed in court.  *Id.*  The defendants took the position that publication of the "complaint" to the plaintiff's attorney constituted pre-suit settlement efforts that were subject to an absolute privilege.  *Id.* at 1327.

Quoting from an old Florida Supreme Court decision, the *Pledger* court recognized that the privilege could be invoked for acts that occurred prior to litigation:

> This privilege extends to the protection of the judge, parties, counsel, and witnesses, *and arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as necessarily preliminary thereto.*

*Id.* at 1326 (quoting *Ange v. State*, 98 Fla. 538, 541, 123 So. 916, 917 (Fla. 1929)) (emphasis in original).  The court found "many examples of publications which are necessarily preliminary to a judicial proceeding" such as actions brought under Florida's Tort Claims Act, the Uniform Commercial Code, landlord-tenant actions, insurance claims, and other contract actions where the parties agreed to a notice

requirement as a condition precedent to suit. *Id.* Noting that Florida courts strongly encouraged pre-litigation settlement negotiations, the *Pledger* court reasoned that publications made under such circumstances (pre-suit settlement negotiations) might similarly constitute necessarily preliminary acts and therefore be entitled to a privilege. *Id.* at 1326-27. *But see Trent v. Mortgage Elec. Registration Systems, Inc.*, 618 F. Supp. 2d 1356, 1361 (M.D. Fla. 2007) (declining to extend the litigation privilege to pre-suit communications which were not required by law; discussing *Echevarria* but not mentioning *Pledger*, and noting the "unsettled state of Florida law" on the issue of whether pre-suit communications fall within the ambit of the litigation privilege).

At the same time, however, the court recognized that the "absolute privilege afforded to necessarily preliminary publications is not without limitation." *Id.* (citing *Myers v. Hodges*, 53 Fla. 197, 210, 44 So. 357, 361 (Fla. 1907) ("We think the ends of justice will be effectually accomplished by not extending the privilege so far as to make it an absolute exemption from liability for defamatory words wholly and entirely outside of, and having no connection with, the matter of inquiry.") and a few cases in which the litigation privilege was qualifiedly rather than absolutely applied to acts arguably taken as necessarily preliminary to litigation). The court reviewed the criteria necessary to raise a qualified privilege: (1) good faith; (2) an interest to be upheld; (3) a statement limited in its scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner. *Id.* at 1327 (citing *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. 1st DCA 1978), which set forth the elements of a qualified privilege in the context of defamatory statements). Then, the *Pledger* court answered the legal

issue presented by holding that "settlement negotiations conducted within the guidelines set forth in *Axelrod v. California*, and the cases cited therein, have the benefit of a qualified privilege." *Id.* (further explaining that an injured party could overcome a qualified privilege by proving express malice or malice in fact).

*Pledger* ultimately found that a question of fact existed as to whether the defendants' pre-suit publication of allegedly defamatory statements had been a good-faith attempt at pre-litigation settlement negotiations or whether it had been done with the express intent to injure the plaintiff. *Id.* at 1328. Accordingly, in the face of contradictory evidence on the question of good faith, the court reversed the lower court's summary ruling in favor of the defendants. *Id.* (if the privilege is qualified and there is sufficient evidence to indicate that the privilege may have been exceeded or abused, the issue of fact must be submitted to the jury; citing *Axelrod*). *See also Silver v. Levinson*, 648 So. 2d 240, 244 (Fla. 4th DCA 1994) (holding that it was premature at the motion to dismiss stage to determine whether defamatory statements made when the defendant allegedly attempted to settle prior to filing suit fell "within the criteria for qualified privilege which may attach to good faith settlement negotiations and whether plaintiff can overcome the privilege by proving express malice or malice in fact"; citing *Pledger*).

Citing *Echevarria* and *Pledger*, the Palmer Law Firm asserts that an *absolute* litigation privilege applies to its demand letters. The firm points out that § 772.11(1) requires a demand letter as a condition precedent to filing suit to recover civil theft

damages.[5]  The demand letters, the firm asserts, were sent in an attempt to settle valid tort claims the retailers had against Plaintiffs.  Releases were provided upon receipt of settlement funds, further evidencing the purpose for which the letters were sent. Consequently, the firm argues, the litigation privilege applies, the content of the letters are protected, and Plaintiffs' FDUTPA and RICO claims based on the content of the letters cannot be sustained.

But *Echevarria* and *Pledger* do not stand for the proposition that the Palmer Law Firm is automatically entitled to *absolute* immunity with regard to its demand letters.  It is true that § 772.11(1) requires written notice prior to initiating a civil theft recovery action, which at first blush suggests absolute immunity because the letters were sent as required by statute.  Yet upon further examination, given the number of letters sent over a multi-year period (literally millions) and the number of lawsuits actually initiated over that same time period (no more than fifteen prior to this lawsuit being filed), and given the firm's retainer agreement that provides (in many instances) for the possibility of litigation services but only pursuant to a separate agreement, we conclude that Plaintiffs have sufficiently raised a question of fact as to whether the demand letters were truly intended as a condition precedent to filing suit as required by § 772.11(1), i.e., whether they were necessarily preliminary to judicial proceedings, or, as Plaintiffs argue, whether they were sent merely as a "scare tactic."  We find, as did the court in *Pledger*, that there is conflicting evidence in this record as to whether the Palmer Law Firm acted in good faith in sending the demand letters.  But for our

---

[5]    The Pennsylvania statute that applies in Plaintiff Kelly's case, 42 Pa. Cons. Stat. § 8308, contains a similar notice requirement.

rulings *infra* on other defenses, the issue of the firm's good faith in sending demand letters should be resolved by a jury.

### D.   *FDUTPA Claims*

#### 1.   *Attorney Conduct Under FDUTPA*

The Palmer Law Firm also contends with a broad brush that FDUTPA does not apply to attorney conduct and thus Plaintiffs' FDUTPA claims must be dismissed. The statute itself does not explicitly mention the legal profession in this context. The firm acknowledges that to date, no Florida court has held that attorney conduct will not give rise to a FDUTPA claim.[6] But the firm cites decisions from courts outside of Florida in which those states' unfair trade practices acts were found to not apply to attorney conduct. Generally, the rationale in those cases is that, whereas lawyers are regulated by their state's highest court, acts committed by lawyers in the course of practicing law will not support claims of unfair trade practices. *See, e.g., Jamgochian v. Prousalis*, No. 99C-10-022, 2000 WL 1610750 (Del. Super. Ct. 2000) (holding that the punitive provisions of the Delaware Consumer Fraud Act were not applicable to attorney conduct occurring within the practice of law given the state supreme court's inherent, constitutional, and statutory authority to discipline members of the state bar; noting the lack of consensus in different jurisdictions as to the applicability of state consumer fraud acts to attorney conduct); *Cripe v. Leiter*, 703 N.E 2d 100 (Ill. 1998) (holding that Illinois's Consumer Fraud Act did not apply to the claim that attorneys charged

---

[6]   The firm mentions it has found no case deciding this issue under the Federal Trade Commission Act, which is explicitly entitled to "due consideration and great weight" in construing FDUTPA. *See* Fla. Stat. § 501.204(2).

excessive fees for legal services because the attorney-client relationship was the subject of regulation by the state supreme court and the legislature did not specify that it intended the consumer fraud act to apply to the role of attorneys in relation to their clients); *Shalabi v. Huntington Nat'l Bank*, No. 01 C 2959, 2001 WL 777055, at *2 (N.D. Ill. July 11, 2001) (relying on the ruling in *Cripe* that the Illinois Consumer Fraud Act did not apply to allegations of misconduct by an attorney engaged in the practice of law).   The firm suggests, alternatively, that if we determine there is insufficient Florida precedent on this issue, we abstain from ruling and permit a state court to determine FDUTPA's applicability to attorney conduct.

We are bound by Florida Supreme Court precedent on matters of Florida law. *See, e.g., United States v. Berdeal,* 595 F. Supp. 2d 1326, 1328 (S.D. Fla. 2009) (citing *Johnson v. Fankell*, 520 U.S. 911, 916 (1997) ("neither this Court nor any federal tribunal has any authority to place a construction in a state statute different from the one rendered by the highest court of that state") and *Cotton States Mut. Ins. Co. v. J.O. Anderson*, 749 F.2d 663, 667 (11th Cir.1984) (state courts have the inherent power "to construe their own statutes and federal courts are bound by that state interpretation")).

In Florida, legislative intent is the polestar that guides the court's inquiry as to the meaning of a statute. *Knowles v. Beverly Enters.-Florida, Inc.*, 898 So. 2d 1, 5 (Fla. 2005) (internal citation omitted).   Legislative intent is discerned primarily from the language of the statute. *Id.* We must give statutory language its plain and ordinary meaning, and we may not "construe an unambiguous statute in a way which would

extend, modify, or *limit*, its express terms or its *reasonable and obvious implications*."
*Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984) (internal citation omitted) (emphasis in
original).   It is fundamental that where the language of a statute is plain and
unambiguous, there is no occasion for judicial interpretation.  *Forsythe v. Longboat Key
Beach Erosion Control Dist.*, 604 So. 2d 452, 454 (Fla. 1992).  Citing a decision more
than seventy years old, the Florida Supreme Court elaborated on this fundamental
rule of statutory construction:

> The Legislature must be understood to mean what it has plainly
> expressed and this excludes construction.  The Legislative intent being
> plainly expressed, so that the act read by itself or in connection with
> other statutes pertaining to the same subject is clear, certain and
> unambiguous, the courts have only the simple and obvious duty to enforce
> the law according to its terms.   Cases cannot be included or excluded
> merely because there is intrinsically no reason against it.  Even where a
> court is convinced that the Legislature really meant and intended
> something not expressed in the phraseology of the act, it will not deem
> itself authorized to depart from the plain meaning of the language which
> is free from ambiguity.   If a Legislative enactment violates no
> constitutional provision or principle it must be deemed its own sufficient
> and conclusive evidence of the justice, propriety and policy of its passage.
> Courts have then no power to set it aside or evade its operation by forced
> and unreasonable construction.

*Id.* (quoting *Van Pelt v.  Hilliard,* 75 Fla. 792, 798, 78 So. 693, 694-95 (Fla. 1918)).

We discern no ambiguity in FDUTPA as to whether attorneys per se are
excluded from its provisions.  They simply are not mentioned, and the firm has not
offered any plausible basis for finding ambiguity under the present statutory scheme.
In the absence of contrary precedent on this issue from the Florida Supreme Court, or
even any guidance from Florida's district courts of appeal, we decline the Palmer Law
Firm's invitation to read attorney conduct out of the statute based only upon an

attorney's status under the law.  *See generally* Fla. Stat. § 501.202(2) (the Florida Legislature expressed its intent that the provisions of FDUTPA be "construed liberally to promote" various policies including the protection of the "consuming public . . . from those who engage in . . . unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."); *Citibank (South Dakota) N.A., N.A. v. Nat'l Arbitration Council, Inc.*, No. 3:04-cv-1076-J-32MCR, 2006 WL 2691528, at *3 (M.D. Fla. Sept. 19, 2006) ("Since FDUTPA does not clearly define what constitutes "unfair and deceptive," courts have held that "the statute should be construed liberally," and that the concept should be regarded as "extremely broad.").

*Echevarria*, discussed above, indirectly supports our conclusion that FDUTPA does not exclude attorney conduct even though that specific issue was never raised in the case.  The issue presented there was whether the litigation privilege could be invoked when a statutory cause of action was being litigated, just as it could when tortious behavior was at issue.  950 So. 3d at 383.  The Florida Supreme Court answered that question in the affirmative: "the litigation privilege applies in all causes of action, statutory as well as common law." *Id.* at 380-81.  The claims in *Echevarria* were based on violations of FDUTPA and the Florida Consumer Collection Practices Act, by a law firm acting on behalf of mortgage lenders in foreclosure proceedings (and other defendants). *Id.* at 381.  In holding that attorneys could avail themselves of the litigation privilege for FDUTPA claims, the court necessarily determined that attorney conduct fell within the purview of the statute.  Had it read FDUTPA to exclude legal

services, there would have been no need to decide whether the litigation privilege applied because the FDUTPA claim would have failed as a matter of law.

We hold, therefore, that attorneys are not automatically exempt from the operation of the statute.  That said, clearly the usual course of legal practice will not implicate the statute because express prerequisites required to invoke FDUTPA will not ordinarily be satisfied.  The following discussion illustrates the point.

### 2.   *Consumer Engaged in Transaction under FDUTPA*

Plaintiffs claim that the Palmer Law Firm has violated and continues to violate FDUTPA by:

> mass mailing civil recovery demand letters to consumers nationwide that give the false impression that: (1) lawyers have evaluated the claim against them; (2) it intends to file a lawsuit against them on behalf of the retailer if they fail to pay; (3) it is entitled to "pre-litigation attorneys fees"; and (4) it is collecting a valid debt rather than making a demand on an unadjudicated tort claim.

[D.E. 119 at 1].  The firm counters that Plaintiffs were not consumers engaged in trade or commerce under the statute so their FDUTPA claims fail as a matter of law.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. 501.204(1).  The stated purpose of this act is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2).   The statute does not define "unfair and deceptive act or practice" but we note that the provisions of the act are to be "construed liberally."  Fla. Stat. § 501.202.  A practice is unfair under the

FDUTPA if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

The Palmer Law Firm argues first that Plaintiffs lack standing to maintain a claim because they did not purchase services or goods from the firm and therefore are not "consumers" able to sue for a FDUTPA violation.[7]  There are several cases that support the firm's argument that only consumers may sue for damages under FDUTPA.  *See, e.g., Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009) (holding that plaintiff, as a non-consumer, was not entitled to bring a claim for monetary damages under FDUTPA); *Cannova v. Breckenridge Pharm., Inc.*, No. 08-81145-CIV, 2009 WL 64337, at *3 (S.D. Fla. Jan. 9, 2009) (dismissing FDUTPA claim because plaintiff failed to allege he acted as a consumer in the conduct of trade or commerce); *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv947-J-33HTS, 2009 WL 2959112, at *8 - *9 (M.D. Fla. July 31, 2008) ("Only consumers may bring private suit under FDUTPA.").

However, other cases hold that *non*-consumers may sue under FDUTPA.  The rationale in these cases is that the 2001 legislative amendments to § 501.211(2) broadened the scope of FDUTPA, to authorize any person or entity who suffered a loss as a result of an unfair or deceptive trade practice or act to bring a suit for damages.

---

[7]     Subsection 501.211(2) provides that "[i]n any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs . . . ." § 501.211(2).  This is in contrast with § 501.211(1), which provides for injunctive relief rather than damages for "anyone aggrieved by a violation of this part. . . ."  § 501.211(1). These two subsections were discussed previously in Sections II.B.1. and II.B.2., *supra*.

Prior to 2001, subsection (2) provided that in an individual action brought "by a *consumer*" who suffered a loss as a result of a violation of the act, "such *consumer*" could recover actual damages.  In 2001, the Florida Legislature replaced the word "consumer" with the word "person."  *See* 2001 Laws of Fla. ch. 2001-39 § 6 (amending § 501.211(2) as described).   Several courts have reasoned that this amendment "demonstrates an intent to allow a broader base of complainants . . . to seek damages" under FDUTPA.  *Niles Audio Corp. v. OEM Sys. Co., Inc.*, 174 F. Supp. 2d 1315, 1320 (S.D. Fla. 2001) (competitor could seek damages under newly amended § 501.211(2)); *see also North Amer. Clearing, Inc. v. Brokerage Computer Sys.*, No. 6:07-cv-1503-Orl-19KRS, 2009 WL 3241983, at *9 (M.D. Fla. Oct. 5, 2009) (declining to grant summary judgment merely because the plaintiff was not a consumer); *James D. Hinson Elec. Contracting Co., Inc. v. Bellsouth Telecomms., Inc.*, No. 3:07-cv-598-J-32MCR, 2008 WL 360803, at *2 - *3 (M.D. Fla. Feb. 8, 2008) ("Courts in this district have held that [the 2001 amendment replacing "consumer" with "person"] demonstrates a clear legislative intent to allow a broader base of complainants w ho have been injured by violations of FDUTPA to seek damages, not just injunctive relief."); *True Title, Inc. v. Blanchard*, No. 6:06-cv-1871-Orl-19DAB, 2007 WL 430659, at *3 - *4 (M.D. Fla. Feb. 5, 2007); *Advanced Protection Technologies, Inc. v. Square D. Co.*, 390 F. Supp. 2d 1155, 1164 (M.D. Fla. 2005); *Gritzke v. M.R.A. Holding, LLC*, No. 4:01CV495-RH, 2002 WL 32107540, at *4 (N.D. Fla. March 15, 2002).[8]

_____

[8]      We note that the vast majority of cases analyzing FDUTPA are federal cases.  *See Kertesz*, 635 F. Supp. 2d at 1350 n. 3 (citing *Beacon Prop. Mgmt., Inc. v. PNR, Inc.*, 890 So. 2d 274, 278 (Fla. 4th DCA 2004) (state court decisions are "rare events" in FDUTPA litigation)).

We agree with these latter cases.   Applying a liberal construction to §
501.211(2), as we are compelled to do when construing the provisions of FDUTPA, *see*
§ 501.202, we see no reason not to conclude that replacing the term "consumer" with
"person" served to broaden the reach of the statute so that more than just *consumers*
could avail themselves of the protection of this statute.[9]  We agree with the line of cases
that so hold as a matter of standing to sue.   Concluding that a non-consumer may
maintain an action for damages under FDUTPA, we find that the Palmer Law Firm
is not entitled to summary judgment merely because Plaintiffs are non-consumers.

---

[9]      We respectfully disagree with the reasoning of our sister court in *Kertesz*,
635 F. Supp. 2d at 1348-50 (Marra, J.).  There, the court examined the legislative
history of § 501.211 and found that the intent of the Legislature in 2001 when it
amended this portion of the statute was to clarify that "businesses, just like
individuals, could obtain monetary damages in FDUTPA cases."   *Id.* at 1349-50
(reviewing Senate Staff Analysis, CS/SB 208, Mar. 22, 2001).  It concluded that only
consumers could sue under the statute.  *Id.* at 1350.

But in 2001, the Legislature made two changes to FDUTPA that are relevant
to the issue before us.   As noted, the Legislature replaced the word "consumer" with
"person." (The term "person", the Committee Staff noted, "is understood to include a
business."  *See* Senate Staff Analysis at 6.)   The Legislature also amended the
definition of "consumer" in § 501.203(7) to add "business" and "any commercial entity,
however denominated."  *See* Laws of Fla. Ch 2001-39 § 1 (amending § 501.203(7) as
described).  So at the same time the Legislature expanded the definition of "consumer,"
it  replaced the term "consumer" with "person" in the section providing for monetary
remedies for a violation of the statute.

To us, this evinces an intent to expand the applicability of the remedies
provision to more than just consumers.  If the purpose had been to assure that
businesses could avail themselves of the remedies under § 501.211(2), given
"inconsistent court interpretations" in which "remedies available to individual
consumers have not always been available to business consumers," *see* Senate Staff
Analysis at 4, that purpose could have been accomplished by the change to the
definition of "consumer" (in § 501.203(7)), such that the term "consumer" did not have
to be replaced with "person" in § 501.211(2).  Thus a non-consumer (like a competitor,
either individually or through a corporate form) could seek relief under the statute *so
long as* the trade or commerce element of the statute was satisfied.

Nevertheless, we are also constrained to find that summary judgment for the firm is still required because Plaintiffs have not satisfied the "trade or commerce" element of FDUTPA.[10]  As noted earlier, FDUTPA prohibits unfair or deceptive acts or practices "in the conduct of any trade or commerce." § 501.204(1).  The term "trade or commerce" is defined as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."  Fla. Stat. § 501.203(8).  Plaintiffs contend that their dealings with the Palmer Law Firm constituted "trade or commerce" because, through the demand letters, the firm solicited and offered them a release, a "thing of value," in exchange for money.  [D.E. 191 at 16].  They cite *Sweringen v. New York State Dispute Resolution Ass'n (N.Y.SDRA)*, No. 05-CV-438 (NAM/DRH), 2006 WL 2811825 (N.D. N.Y. Sept. 28, 2006), as support for the argument that "releasing legal claims for money constitutes a business that satisfies any 'trade or commerce' requirement." [D.E. 191 at 17].

*Sweringen* is not applicable to our analysis.  The defendant in that case was an organization that mediated disputes between individuals sexually abused by priests as children and the Roman Catholic Diocese of Albany, New York.  2009 WL 2811825, at *1.  The plaintiffs were sexually abused by priests as children and participated in the defendant's mediation program.  *Id.*  They alleged that the defendant's conduct,

---

[10]    Whether certain acts and practices fall within the scope of "trade or commerce" is a separate question from whether a plaintiff has standing to sue under FDUTPA.

including public statements that it was "independent" and not an advocate for one party over another when in fact it had a financial relationship with the Albany Diocese, constituted deceptive business practices likely to mislead the public and victims of abuse. *Id.* at *1, *5. Under the New York deceptive trade practices statute applicable in that case, the plaintiff was required to demonstrate that (1) the defendant's deceptive acts were directed at consumers; (2) the acts were misleading in a material way; and (3) the plaintiff had been injured as a result. *Id.* at *5. The defendant sought dismissal on the ground that the wrong alleged by the plaintiff was not a "consumer-type" transaction that "effects" the public. *Id.* The motion to dismiss was denied because the court could not say, at that preliminary stage of the case, that plaintiffs could prove no set of facts in support of their claim. *Id.*

Plaintiffs' reliance on *Sweringen* is unavailing as the New York deceptive trade practices statute does not contain a "trade or commerce" element expressly found in the Florida statute. The case is factually distinguishable as well. The allegedly deceptive conduct in that case did not pertain to offers of settlement and release between two parties, but rather to representations made by the dispute resolution organization of its impartiality and neutrality in mediating disputes. The case had nothing substantively to do with the release of legal claims for money or whether such activity constituted "trade or commerce" under New York's deceptive trade practices law.

In any event, we do not agree with Plaintiffs that the Palmer Law Firm's pursuit of civil theft remedies under § 772.11 falls within the meaning of "trade or commerce" such that the firm could be subject to liability under FDUTPA. While it has some

initial appeal, we do not find that the firm's offer to settle and release claims for money constitutes soliciting and offering to Plaintiffs a "thing of value" under the act.

It is worth reiterating that the purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises" from "unconscionable, deceptive, or unfair acts or practices *in the conduct of* any trade or commerce." § 501.202 (emphasis supplied).  The Palmer Law Firm's acts – conduct ostensibly occurring during the exercise of a legal remedy – had zero connection whatsoever to any "trade or commerce."

There is scant authority in Florida on the issue of whether conduct occurring in the pursuit of legal remedies such as occurred here constitutes "trade or commerce" under FDUTPA.  In *Trent v. Mortgage Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356 (M.D. Fla. 2007), *aff'd*, 288 Fed. Appx. 571 (11th Cir. 2008), the court dismissed a FDUTPA claim involving pre-suit communications to collect debts, observing that the "trade or commerce" requirement was not met where the defendant was simply pursuing legal remedies against the plaintiff:

> [U]nder the plain language of the statute, [the defendant] did not "advertise, solicit, provide, offer or distribute" anything.  What [the defendant] did is obtain a legal interest in a note from third party lenders (becoming the "holder" of the note so that it could lawfully foreclose) and then proceeded to foreclosure.  That [the defendant] communicated pre-suit with plaintiffs that it was a "creditor" or "owned" the debt does not fall within the purview of "trade or commerce."

*Id.* at 1365 n.12.

On the other hand, *Hinson* involved the FDUTPA claim of an electrical contractor who damaged a utility company's underground lines, then claimed that the

bill for damages sent by the utility pursuant to state law was in excess of the total sum of the utility's losses. 2008 WL 360803, at *1. The plaintiff alleged that the utility's practice of marking up its bills violated the FDUTPA. *Id.* The utility moved for dismissal on the ground that the activities between the parties did not occur in the conduct of trade or commerce. *Id.* at *3. The court denied the motion to dismiss, noting that the utility company was generally involved in offering telecommunications systems to the general public and that maintaining and repair of its underground cables seemed to be an integral part of the utility's business. *Id.* Later, the court denied summary judgment for the utility (in part) on this same basis, noting in particular FDUTPA's "broad definition of 'trade and commerce." *See James D. Hinson Elec. Contracting Co., Inc. v. Bellsouth Telecomms., Inc.*, No. 3:07-cv-598-J-32MCR, slip. op. at 21-22 (M. D. Fla. July 13, 2009) [D.E. 97]. *See also Kelly v. Nelson, Mullins, Riley & Scarborough, L.L.P.*, No. 8:01CV1176T27MAP, 2004 WL 4054841, at *9 (M.D. Fla. Nov. 17, 2004) ("Assuming, giving FDUTPA's liberal construction, that the provision of legal services is covered by the statute's definition of 'trade or commerce,' the conduct alleged here does not rise to the level of an unfair or deceptive practice . . . .").

The parties have not identified, nor have we located, any Florida state court case that squarely addresses this issue. We have located a few cases from other states that offer guidance, though. These courts have concluded that conduct in pursuit of legal remedies is not "trade or commerce" under their respective states' unfair trade practices acts. In *Dalesandro v. Longs Drug Stores Cal., Inc.*, 383 F. Supp. 2d 1244,

1250-51 (D. Hawaii 2005), the parties negotiated for the production of documents for settlement purposes prior to the inception of litigation. *Id.* at 1246. The court found that the conduct had "occurred purely in the context of settlement and preparation for litigation, which is distinct from a 'business context.'" *Id.* As such, the defendant was not engaged in "trade or commerce" within the meaning of the Hawaii statute which, like Florida's statute, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.*

In *Begelfer v. Najarian*, 409 N.E.2d 167, 169-70 (Mass. 1980), the plaintiff borrowers failed to make payments under a promissory note, leading the defendant lenders to exercise a default provision in the note and make a written demand for payment. The plaintiffs then claimed that the promissory note was void due to a violation of Massachusetts's usury law and further, that violation of the usury law was an unfair and deceptive act entitling them to damages and fees under the Massachusetts consumer protection act. *Id.* The court held in relevant part that "[a] person is not engaged in trade or commerce merely by the exercise of contractual or legal remedies." *Id.* at 176.

The court in *Benvenuti Oil Co. v. Foss Consultants, Inc.*, No. CV010485270S, 2006 WL 328678, at *10 (Conn. Super. Ct. Jan. 25, 2006), determined that an isolated act of forgery did not take place in a "business context" but in a "litigation context" arising out of a dispute between two businesses that were brought to court. The forged document, purportedly a copy of an agreement between the businesses, had nothing

to do with the conduct of the business at the time but rather, was created "solely to enhance the chances of prevailing in litigation arising out of a business dispute." *Id.*

We recognize that FDUTPA is to be construed liberally. Yet we find Plaintiffs' attempt to include pre-suit demand letters within the scope of the term "trade or commerce" simply misses the mark. We will not hold under these facts that soliciting or offering a release in exchange for money is the equivalent of soliciting or offering a "thing of value" under FDUTPA. There is simply no connection or nexus to trade or commerce between these parties through the firm's demand letters. And absent that important nexus, the entire FDUTPA statutory scheme simply does not apply to these particular circumstances, even if a reasonable juror could find that the firm's conduct amounted to deceptive conduct. A contrary result would, indeed, expose a great deal of pre-litigation tactics by attorneys to potential exposure under the statute, which is a result not contemplated by the statute. Thus, even though a lawyer's status per se is not a bar to relief (because certainly some lawyers may engage in trade or commercial transactions while acting as lawyers), the particular conduct at issue here does not fall within the statute's umbrella.

We have no choice, therefore, but to recommend that summary judgment be granted for the Palmer Law Firm on this issue and that the FDUTPA claims be rejected. We also pause and recognize that a motion to dismiss filed earlier in this case raised this issue in part. On a bare record, and given the allegations of a well-pleaded complaint, the Court denied the motion. On summary judgment, however, the Court has the benefit of discovery and a complete record. That record shows that the only

facts that Plaintiffs rely upon to satisfy the trade or commerce requirement here are insufficient as a matter of law.  A reasonable juror on this record could not find that an offer to exchange a settlement payment with a legal instrument – a release – amounts to "any good or service" or "any property" or any other "thing of value," as those terms are used in the "trade or commerce" provision of the statute.

### E.   *RICO Claims*

#### 1.   *"Enterprise"*

Plaintiffs allege that the Palmer Law Firm violated 18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  To prevail on their RICO claims, Plaintiffs must prove (1) a conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006); *Hibiscus Assoc. v. Bd. of Trustees*, 50 F.3d 908, 920 (11th Cir. 1995).

The Palmer Law Firm first focuses on the "enterprise" element in seeking summary judgment in its favor on Plaintiffs' RICO claims.  The firm argues that Plaintiffs have failed to establish that the firm is separate and distinct from the RICO enterprise itself.  The firm also argues that Plaintiffs have not demonstrated that the firm participates in the operation or management of the alleged enterprise.  As discussed below, both are undisputably necessary to sustain a RICO claim.

Plaintiffs allege that the RICO enterprise is comprised of: (1) the Palmer Law Firm; (2) retailers that contract with the firm to collect civil theft damages; (3) local attorneys around the country who contract with the firm and allow it to sign civil demand letters on the local attorneys' behalf ("of counsel" attorneys); and (4) APIS Asset Protection Information System, a web-based management tool that the firm utilizes for loss prevention produced by New York-based RuMe Interactive Corporation ("RIC") and Learn It Solutions. [D.E. 11 ¶ 26]. Plaintiffs claim that the Palmer Law Firm "uses a system that allows it to manipulate and control civil theft collection threats to customers and conceal the true facts about that collection." [*Id.* ¶ 29]. The firm allegedly "controls and operates the RICO enterprise as follows:

(a)   By developing themselves, and, through the PLFE [Palmer Law Firm Enterprise], a scheme whereby the retailers provide the Palmer Law Firm with consumer information;

(b)   By agreeing that this consumer information would be processed using software developed by RIC and other third party entities in order to generate a form demand letter;

(c)   By engaging local attorneys to allow their names to be affixed on the form demand letters without attorney review;

(d)   By agreeing to use and using millions of these form letters to demand from consumers a computer-generated amount via the U.S. mail and other methods;

(e)   By engaging and paying RIC and other third party entities to develop automated systems for collecting the demanded amounts;

(f)   By agreeing to and using those systems to process claims and demand payments.

[*Id.*]

An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981) ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct."); *Williams*, 465 F.3d at 1284.

To establish a valid enterprise to sustain RICO liability, Plaintiffs must prove that each party to the enterprise is separate and distinct from the other. *E.g., Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) (to establish liability under § 1962(c), a plaintiff must prove the existence of two different entities, a "person" and an "enterprise" that is not simply the same "person" referred to by a different name); *Turkette*, 452 U.S. at 583; *United States v. Goldin Industries, Inc.*, 219 F.3d 1268, 1270-71 (11th Cir. 2000). Each RICO defendant must be separate and distinct from the enterprise because liability "depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's* affairs,' not just their *own* affairs." *Cedric Kushner*, 533 U.S. at 163 (internal citation omitted; emphasis in original).

As our court has previously explained:

> [b]ecause a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.

*Florida Evergreen Foliage v. E.I. Dupont de Nemours & Co.*, 336 F. Supp. 2d 1239, 1261 (S.D. Fla. 2004) (internal citations omitted) (holding that the distinctiveness requirement was not met where alleged enterprise consisted of corporation, employees, outside counsel, and agents and consultants); *see also Acosta v. Campbell*, No. 6:04cv761ORL28DAB, 2006 WL 146208, at *6 (M.D. Fla. Jan. 18, 2006) (law office and mortgage holders that engaged in debt collection activities following foreclosure on plaintiff's mortgage were not separate and distinct entities for purposes of RICO liability).

Here, the Palmer Law Firm argues that it was merely providing legal services to its retail clients and, as an agent of those clients, cannot be deemed an entity separate and distinct from the enterprise. While we do not agree that the firm was providing purely traditional legal services, we do agree that it was in any event acting as an agent for its retail clients and therefore was not a separate and independent entity.

The record reflects that the firm represents retail stores and other commercial entities in an effort to assist them recover damages under civil theft recovery statutes. [*See, e.g.,* D.E. 165-11 ¶ 2]. Natt Reifler, the Palmer Law Firm partner who supervises the legal department and collections, described the types of services the firm provided to its clients. [D.E. 119-12 ¶ 15]. They include: communicating regularly with current and prospective clients; reviewing, evaluating, and analyzing state statutes and discussing their applicability with particular clients; reviewing, evaluating, and analyzing narratives provided by retail clients to determine whether the facts give rise

to civil retail theft claims; preparing demand letters; communicating with opposing counsel and opposing parties; negotiating and settling retail theft claims on behalf of clients; preparing various legal documents for clients; filing lawsuits on behalf of clients, and attending court proceedings and mediations in those cases. [*Id.*]. Reifler avers that the firm is "directed by its retail clients on a case-by-case basis on how to proceed in representing their rights and interests with respect to their claims, including filing lawsuits to recover damages when the retailers deem it appropriate." [D.E. 165-11 ¶ 3].[11]

The aforementioned activities are included within some of the services performed by a law firm engaged in a civil recovery practice. Some of the work clearly was legal in nature. If the Palmer Law Firm were acting as an agent for its clients, it cannot be deemed an entity separate and distinct from the enterprise for RICO liability purposes. But Plaintiffs claim that the firm went beyond the mere provision of traditional legal services and actively participated in directing the enterprise. According to Plaintiffs, the firm created and operated a fraudulent civil theft collection scheme that it "openly touted and marketed . . . as its own proprietary (and lucrative)

---

[11]     According to the firm, the retail clients initially determine which suspected shoplifters to pursue for civil theft damages based on the retailers' own internal loss prevention and investigation procedures. [*See, e.g.,* D.E. 213 at 72-73, 78]. The retailers then send relevant information about the individuals to the Palmer Law Firm, which conducts its own independent review of some but not all of the files, depending on the level of internal review conducted by the retailer. [*Id.*] According to Reifler, this includes reviewing its clients' procedures to determine what level of review was conducted and what the clients' expectations were. [*Id.*]. The firm then generates a civil demand letter for the retailer.

business idea." [D.E. 191 at 9].[12]  Plaintiffs say the firm decided who to send demand letters to, yet it hired so few lawyers that a factual and legal analysis of the circumstances surrounding any particular demand letter was impossible.  The firm charged attorneys' fees for legal work it did not perform.  The firm created a network of "of counsel" attorneys in other states who signed demand letters that were generated in Florida, but those "of counsel" attorneys could not even look at the file if they wanted to before the letters were sent out.  Plaintiffs cite the firm's proposal for civil recovery services sent to prospective clients as evidence that legal services took a back seat to the firm's collection services.  [D.E. 189-2].[13]

Again, however, even if the firm's legal services took a backseat to its collection services on behalf of the client, that still does not make the firm any less of an "agent" for purposes of defining the members of the enterprise.  The Palmer Law Firm's tactics,

---

[12]      To carry out its collection scheme, Plaintiffs say, the Palmer Law Firm generated civil demand letters based on electronic files received from retail clients that contained a minimal amount of information about the individuals, including age, date of detention, address, and value of the merchandise.  [D.E. 192 at 5 ¶ 2].  The firm then used computer software to generate form demand letters that automatically calculated the demand amounts and electronically affixed attorneys' signatures to the letters.  [*Id.* ¶ 3].  The demand letters were sent out without an attorney having reviewed the claim or the letter itself prior to mailing.  [*Id.* at 6 ¶ 9].  The letters implied that if payment were not made, civil litigation would ensue.  [*Id.* at 5 ¶ 5].  However, the firm knew it was highly unlikely that a lawsuit would ever be filed, having filed only 15 lawsuits on behalf of retail clients in the four years prior to commencement of this action.  [*Id.* at 6 ¶ 6].  Indeed, many of the firm's contracts with retail clients did not even provide for litigation services; that representation could be provided, though, under an entirely separate agreement.  [*Id.* ¶ 7].  Indeed, J.C. Penney, one of the firm's clients on whose behalf a demand letter was sent to Plaintiff Kelly, advised that it had never entered into a separate litigation agreement with the firm.  [*Id.* ¶ 8].

[13]      There is no evidence that this proposal, which was submitted to the Target Corporation, was ever accepted by Target, and Target is not currently a client of the Palmer Law Firm.  [D.E. 119-2 at 54-55, 62-63].

even if deceptive or extortionate, were not separate and apart from its corporate client seeking to obtain a civil recovery from the Plaintiffs. They were and are, for RICO purposes, the same actors. The corporate client simply utilized its attorney/agent to do what the corporate client would theoretically be entitled to do under the respective civil recovery statutes. We cannot find, on this record, that the two were acting distinctly such that they could be deemed part of an "enterprise" under the statute.

Moreover, to hold the Palmer Law Firm liable under § 1962(c), Plaintiffs must prove, in addition to distinctiveness, that the firm participated in the operation or management of the enterprise itself. In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court addressed the degree of participation in the conduct of an enterprise necessary to impose liability under RICO. The issue was whether an outside accounting firm could be held liable for incorrectly valuing a farm cooperative's assets on the co-op's financial statements. The Court adopted the "operation or management" test, stating:

> In order to "participate, directly or indirectly, in the conduct of such enterprises's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* degree in directing the enterprise's affairs is required. The 'operation or management' test expresses this requirement in a formulation that is easy to apply.

*Id.* at 179 (emphasis in original). Applying this test, the Court concluded that the accounting firm did not participate in the operation or management of the enterprise itself. *Id.* at 185-86.

We similarly conclude that the Palmer Law Firm did not participate in the operation or management of the enterprise in our case. Courts following *Reves* have generally held that the provision of traditional legal services does not constitute the "operation or management" of an enterprise for purposes of RICO liability. *See, e.g., Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A.*, 938 F. Supp. 825, 827 (S.D. Fla. 1996) ("providing standard legal services does not create RICO liability under the operation and management standard."); *Design Pallets, Inc. v. Gray Robinson, P.A.*, No. 6:07-cv-655-Orl-31KRS, 2008 WL 3200275, at *5 (M. D. Fla. Aug. 5, 2008) (evidence that law firm drafted strategy memos, board meeting agendas, letters to shareholders, business plans, sales and license agreements, and various other documents, on behalf of an allegedly corrupt organization whose goal was to wrest control of a company from one of its shareholder, was insufficient to show that law firm did anything more than act as legal counsel; even if lawyer's conduct fell below the professional standards expected of a lawyer in his community, e.g., he violated his duty of candor and made false representations to shareholder, this conduct does not rise to the level of a RICO violation); *Nolte v. Pearson*, 994 F.2d 1311, 1316-17 (8th Cir. 1993) (law firm's drafting of documents sent to prospective clients based on information provided by client did not establish RICO liability; no evidence that firm participated in conduct of the affairs of the enterprise); *Gilmore v. Berg*, 820 F. Supp. 179, 183-84 (D. N.J. 1993) (lawyer's preparation of allegedly misleading tax opinion letter merely constituted the rendition of legal services, not participation in the direction of the affairs of the enterprise); *Petri v. Gatlin*, 997 F. Supp. 956, 986 (N.D. Ill. 1997)

(although an accountant, like an attorney, "manages" several aspects of its client's matters, that type of "management" is not synonymous with the "operation or management" of an enterprise required to sustain a RICO claim; collecting cases).

Based on the record before us, we also find that the Palmer Law Firm did not go beyond rendering traditional legal services to its clients. Although the clients delegated some tasks and authority to the firm, the clients ultimately retained control over the litigation, dictating when to file suit, who to pursue with a demand letter, and whether to accept a settlement. *Petri*, 997 F. Supp. at 986 ("The person to whom authority is delegated may enjoy a considerable amount of discretion in carrying out those tasks, but the ultimate decisionmaking power resides with the delegator."); *see also Boca Raton Comm. Hosp., Inc. v. Tenet Healthcare Corp*, 502 F. Supp. 2d 1237, 1253 (S.D. Fla. 2007) (the key to "distinctiveness" depends less on whether corporations are separate in the legal sense and more on whether they are free to act independently of each other and to advance their own separate interests). Plaintiffs have not produced evidence to the contrary.

The essence of Plaintiffs' complaint is that the firm used computer software to generate thousands of demand letters that automatically calculated a demand amount, wrongfully threatened a lawsuit, and electronically affixed an attorney's signature without attorney review. [D.E. 192 at 3 ¶ 30]. Whether the services the firm provided were proper or fell below the standard of care recognized for lawyers in Florida, they were provided as an agent for an employer, and RICO liability will not attach. *See, e.g., Florida Evergreen*, 336 F. Supp. 2d at 1261 n1. (rejecting plaintiffs' argument that

committing dishonest acts were not a regular part of the affairs of a corporation such that commission of such acts by employees or agents could constitute acts of separate and distinct people; rather, "the fact that the affairs DuPont [through its employees and agents] was conducting allegedly involved fraud was not relevant to court's conclusion that the plaintiffs had not alleged a distinct enterprise."); *Design Pallets*, 2008 WL 3200275, at *5 (plaintiffs could take issue with advice law firm gave client and its actions in facilitating the client's scheme to wrest control of company from shareholder but in the end, the evidence showed the firm only provided legal advice); *Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539-40 (3d Cir. 1993) (distilled to their essence, plaintiffs' allegations were that financial auditor provided materially deficient financial services; "[i]t cannot be said that by merely performing what are generic financial and related services to an insurance company, even if they are later found to be deficient, an accounting firm has opened itself to liability under the federal racketeering statute.").

Plaintiffs cite *Bocciolone v. Solowsky*, No. 08-20200-CIV, 2009 WL 936667 (S.D. Fla. 2009), in which the district court summarily held that an attorney who "crosses the line between traditional rendition of legal services and active participation in directing the enterprise" is not shielded from RICO liability.  *Id.* at *4 (quoting *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997)).  But that case is clearly distinguishable from ours.  In *Bocciolone*, the court accepted as true, as it was required to do when considering a motion to dismiss, that the lawyers made numerous written and oral misrepresentations; improperly accepted a $6 million wire transfer to the

firm's trust account; and transferred money out of the trust account for their own benefit. *Id.* at *4. Based on those facts, the court found the plaintiffs had sufficiently supported their claim that the lawyers went beyond the offering of traditional legal services and volunteered to take part in the defendants' enterprise. *Id.* No such conduct has been alleged or proven in our case, and there is no evidence in the record that convinces us that the Palmer Law Firm crossed the line here. *Accord The Cadle Co. v. Flanagan*, No. 301CV531AVC, 2006 WL 860063, at *9-11 (D. Conn. Mar. 31, 2006) (evidence presented at trial showed that lawyers wrongfully advised a client that he was free to disregard a federal injunction and turnover order, and lawyers knowingly filed false documents with the court in an effort to frustrate collection efforts on a final judgment; such conduct constituted decision-making for the enterprise or, at the very least, the knowing implementation of decisions designed to defraud the plaintiffs).[14]

As for the other alleged members of the Palmer Law Firm Enterprise, the "of counsel" lawyers from around the country were similarly agents of the retail clients who provided legal and other services in their respective jurisdictions. Moreover, Plaintiffs have not refuted the firm's assertion that it was never associated with RuMe Interactive Corporation or Learn It Solutions. Accordingly, because the Palmer Law Firm and the "of counsel" lawyers were agents of independently operating retailers,

---

[14]     We note as well that we do not necessarily agree that *Bocciolone*'s holding alters the result here based upon the prior discussion as to whether or not the firm can constitute a separate actor for RICO enterprise purposes. That issue was not addressed in this decision. And we also do not necessarily agree that *Bocciolone*'s statement of the law that is addressed in the decision is correct in the Eleventh Circuit.

and the computer companies are not involved in producing civil demand letters, Plaintiffs have failed to establish the existence of a RICO enterprise necessary to sustain a claim under § 1962(c).

Plaintiffs also assert a violation of 18 U.S.C. § 1962(d), which makes it unlawful to conspire to violate § 1962(c). However, as Plaintiffs have not produced evidence that supports a violation of § 1962(c), their § 1962(d) claim fails as well. *See Gilmore*, 820 F. Supp. at 184 (a plaintiff whose allegations cannot make out a claim under § 1962(a), (b), or (c) cannot maintain a claim under § 1962(d)).

Based on the foregoing, because we find that Plaintiffs have failed to establish the existence of an enterprise or, if one existed, that the Palmer Law Firm participated in the operation or management of the enterprise, we are again constrained to recommend that the firm's motion for summary judgment on Plaintiffs' RICO claims be granted.[15]

### 2.    *Noerr-Pennington Doctrine*

The Palmer Law Firm argues that Plaintiffs' RICO claims are barred by the *Noerr-Pennington* doctrine because the pre-litigation demand letters are protected communications under the Petition Clause of the First Amendment. In light of our

---

[15]    In urging us to find that the Palmer Law Firm's business relationship with its clients goes beyond the offering of traditional legal services, Plaintiffs claim the Court has already determined that the firm's "collection scheme" is not the practice of law. [D.E. 191 at 9]. Plaintiffs are referring to Judge Moreno's ruling that the attorney-client privilege did not apply because the firm was "not engaging in the practice of law when its computer generates and sends out thousands of civil demand letters each month." [D.E. 61 at 1]. We agree with that particular conclusion based on the argument then being made, but we note the ruling was made in the context of a motion to compel, at an early stage of litigation, and does not control our conclusion now as we consider case-dispositive motions with supporting documentation.

determination that Plaintiffs have not established RICO violations, we need not rule on the *Noerr-Pennington* issue. We note, however, that the firm's argument for application of this limited doctrine, which arises in the antitrust context and involves dealings with governmental agencies, likely has little application to the claims raised in this case. But we need not delve into this issue given the more relevant arguments raised in opposition to this RICO claim.

### 3.   *Proximate Cause to Sustain RICO Claim*

The Palmer Law Firm finally argues that Plaintiffs Kelly and Simon lack the requisite proximate cause to sustain their RICO claims. The firm contends that neither of these Plaintiffs relied on the allegedly misleading and deceptive statements in the civil demand letters when deciding whether or not to make payments to the Palmer Law Firm. The firm points to deposition testimony by Kelly and Simon in which they acknowledge they mistrusted the statements in the demand letters, and Simon explains she paid only as a matter of convenience, to "get it off our back." [D.E. 165-3 at 24]. Consequently, the firm contends, Plaintiffs Kelly and Simon lack the requisite proximate cause to sustain RICO claims.[16]

Again, however, based on our determination above that Plaintiffs have not presented sufficient evidence to support a RICO claim, we need not address this limited issue of proximate cause.

---

[16]     Plaintiffs concede that Kelly does not meet the injury requirement of a RICO claim so they have voluntarily withdrawn her individual RICO claim. [D.E. 191 at 8 n.4].

**F.**     **_Unjust Enrichment and Money Had and Received Claims_**

The Palmer Law Firm also seeks entry of judgment in its favor on the remaining claims in the complaint for "money had and received" and unjust enrichment claims (Counts III and IV).  In the former, Plaintiffs assert that the firm received and obtained money from them and class members through unfair, unreasonable, and unconscionable practices that conferred no true benefit on class members, and the firm should be required to refund such amounts and cease future collection efforts.  In their unjust enrichment count, Plaintiffs claim that the Palmer Law Firm received, and continues to receive, a benefit at the expense of the Monetary Class, by deceptively charging, attempting to collect, and collecting amounts under circumstances in which it would be inequitable for the firm to retain the money.

In Florida, the elements of both causes of action are the same.  *See Equilease Corp. v. Hentz*, 634 F.2d 850, 853 (5th Cir. 1981) (restitution, unjust enrichment, and an action for money had and received are different names for the same cause of action).[17]  To prevail on either of these claims, Plaintiffs must show that (1) they conferred a benefit on the Palmer Law Firm; (2) the firm appreciated such benefit; and (3) acceptance and retention of such benefit by the firm under the circumstances would be inequitable without paying for it.  *Challenge Air Transport, Inc. v. Transportes Aereos Anacionales, S.A.*, 520 So. 2d 323, 324 (Fla. 3d DCA 1988) (purpose of an action for unjust enrichment is "to prevent the wrongful retention of a benefit, or the

---

[17]     In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity"); *Moore Handley, Inc. v. Major Realty Corp.*, 340 So. 2d 1238 (Fla. 4th DCA 1976) (an action for money had and receive may be maintained "whenever one has money in his hands belonging to another, which in equity and good conscience, he ought to pay over to that other").

The Palmer Law Firm argues that these claims should be rejected because the firm did not receive a benefit to which it was not entitled.  It is the firm's position that Plaintiffs Simon and Baum voluntarily settled tort claims for which they owed damages to the firm's retail clients pursuant to Florida's civil theft statute, Fla. Stat. § 772.11.  The firm explains that the demand letters were sent pursuant to the procedure outlined in § 772.11(1), which requires written notice before a party can file a lawsuit under this statute.  Plaintiffs thereafter made payment to the firm and in exchange, received written releases from further liability or obligation to the retail clients, as required by § 772.11(1).  The firm says it did not collect anything more than what this statute authorizes and no more than that which it was statutorily entitled to receive.  [D.E. 165 at 19-20].

Plaintiffs counter that the pre-suit notice requirement of § 772.11(1) does not "immunize" the Palmer Law Firm "from liability for its abusive conduct in its civil recovery 'practice.'"  [D.E. 191 at 19].  Plaintiffs claim that through "sharp practices," i.e.,  sending demand letters ostensibly from an attorney but without attorney review or verification, and with harassing language, literally thousands of such letters each

month with a local attorney's name affixed by computer, the firm has received a benefit, one that would be unjust and inequitable for it to retain.

In response, the firm posits that even if Plaintiffs' allegations of deception were true, they nevertheless cannot prevail on the money had and received and unjust enrichment claims because:

> money paid under a mistake of facts cannot be reclaimed, where the plaintiff has derived a substantial benefit from the payment, nor where the defendant received it in good faith in satisfaction of an equitable claim, nor where it was due in honor and conscience.

*Pensacola & A.R. Co. v. Braxton*, 34 Fla. 471, 481, 16 So. 317, 321 (Fla. 1894); *see also Equilease*, 634 F.2d at 853 ("It is well settled under Florida law that money paid under a mistake of fact cannot be recovered where the payee 'received it in good faith in satisfaction of an equitable claim, nor where it was due in honor and conscience.'" (quoting *Braxton*)).   The firm asserts that Plaintiffs received, in exchange for settlement funds, releases of tort claims against them by the firm's retail clients, as contemplated by § 772.11(1).

Initially, we conclude that Plaintiff Kelly cannot prevail as a matter of law on either of these claims.  She paid nothing to the Palmer Law Firm which, therefore, never received any money, property, or other benefit from her.  Summary judgment for the firm should be granted as to Counts III and IV with regard to Kelly.

As for Plaintiffs Simon and Baum, we think that they, too, cannot prevail on these claims.  Even if the demand letters were misleading, Plaintiffs settled potential tort claims against them, thus receiving a substantial benefit in the process.  Plaintiffs

have failed to raise any disputed issues of material fact in connection with either of these claims sufficient to send them to the jury.[18]

Accordingly, we also have to recommend summary judgment for the Palmer Law Firm on Counts III and IV.

---

[18]     Plaintiffs focus on the allegedly deceptive civil recovery practices employed by the Palmer Law Firm but do not claim the amount of money Simon and Baum paid was excessive under § 772.11(1).  They do assert generally that the firm uses a software system to "automatically calculate an excessive demand amount" [D.E. 192 at 5 ¶ 35], but they have not shown that the settlement amounts *they* paid to the Palmer Law Firm were out of line with the damages authorized by the statute, nor that the retailers were not entitled to pursue civil theft claims against them. Notwithstanding Plaintiff Simon's testimony that she did not believe her son stole anything from Wal-Mart and she only paid because she wanted to avoid being sued and incur additional legal expenses [D.E. 165-3 at 12-13, 18, 20, 24, 49-50], the record reflects that her son was arrested for shoplifting and appeared in court, where adjudication was withheld.  [*Id.* at 15].  Plaintiff Baum's daughter was charged with misdemeanor petty theft at Macy's; after completing community service hours, the charges were dropped.  [D.E. 165-5 at 11, 18, 20-22].  Given the record, neither of these Plaintiffs can legitimately claim that there was no possible basis for recovery under § 772.11, which contemplates civil recovery for attempted shoplifting.  *See* § 772.11(1) ("Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of ss. 812.012 - 812.037 . . . has a cause of action . . . ."); Fla. Stat. § 812.014 (theft includes *endeavoring to* obtain or use the property of another with the intent to temporarily or permanently deprive the other person of a right to the property or to appropriate the property to his or her own use).

Furthermore, with respect to the claim that the Palmer Law Firm demanded excessive attorneys' fees that were "completely arbitrary" and bore no relation to the amount of work performed [D.E. 192 at 9 ¶ 22], Plaintiffs Simon and Baum have not shown that they paid an excessive amount of attorney's fees.  In fact, it appears that Baum paid exactly the minimum damages amount contemplated by § 772.11(1) ($200), and no more.  Thus, Plaintiffs have not demonstrated how, under the circumstances of the case, it would be unfair for the Palmer Law Firm and the retailers to retain the sums paid to them by these Plaintiffs.  *Moore Handley*, 340 So. 2d at 1238 ("Everything depends on the circumstances of the individual case and whether or not the pleader has alleged facts which show that an injustice would occur if money were not refunded.").

### III.   CONCLUSION

For the foregoing reasons, this Court recommends that

1.    Defendant Palmer, Reifler & Associates, P.A.'s Motion for Summary Judgment [D.E. 165] be **GRANTED** and that summary judgment be entered in Defendant's favor and against each Plaintiff on all counts.

2.    Plaintiffs Veronica Kelly, Lil Simon, and Ron Baum's Motion for Partial Summary Judgment on Liability for Violations of FDUTPA [D.E. 119] be **DENIED**.

3.    Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.   *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 30th day of October, 2009.

EDWIN G. TORRES
United States Magistrate Judge